OPINION OF THE COURT
Gloria Sosa-Lintner, J.
The ultimate issue presently before the court is whether the child Umani K., date of birth August 1, 1992, should be returned to the care and custody of his parents, the respondents herein, or continued in foster care. (Family Ct Act §§ 1062, 1055 [b].) In order to make that determination, the court must consider whether the conditions and circumstances that gave rise to the child’s placement on September 11, 1995 have changed, whether the family services plan requires review, adjustment, or modification, the extent to which such plan has been complied with by the respondents, and whether a further extension of that placement is consistent with the best interests of the child. (Family Ct Act § 1055 [b] [iv] [A], [B]; Social Services Law § 409-e.)
After careful consideration of the evidence presented at the lengthy hearing held pursuant to both Family Court Act § 1055 (b) and § 1064, the court issued an order on March 26, 1998 extending placement until September 10, 1998 with provisions for a trial discharge of the child by July 20, 1998. This decision now elaborates on the court’s finding that the respondents’ compliance with the directives of the Administration for Children’s Services as well as their personal initiative in addressing the issues that led to the child’s original placement require a change in the current order of placement. Consequently, the court also finds that the Administration for Children’s Services has not met its burden of showing that continued placement is in the child’s best interests. (Matter of Ian S., 241 AD2d 981 [4th Dept 1997]; Matter of Sunshine A. Y., 88 AD2d 662 [2d Dept 1982]; Matter of S. B., 165 Misc 2d 632 [Fam Ct 1995].) The court makes this finding despite the serious nature of the underlying abuse finding, which involved the death of Umani’s sibling.
PROCEDURAL HISTORY
The original child abuse action was initiated by the filing of petitions on December 28, 1994 involving two children, Zoltán K., born June 29, 1993, and Umani K., born August 1, 1992. The petition as to Zoltán abated when the child subsequently died. The remaining petition was amended on March 6, 1995, alleging that the respondent mother, Huma K, and respondent *710 father, Naeem K., had allowed the abuse of their children, and that the respondent mother caused the death of one of the subject children, Zoltán. Throughout the pendency of the Family Court proceedings, the respondent mother was incarcerated, but the respondent father was never criminally charged with Zoltan’s death.
After a hearing on June 29, 1995, during which neither respondent testified nor presented any evidence, the Honorable Sara P. Schechter entered a finding of abuse against the respondent mother: “based on proof that while in the Respondent-mother’s care, child Zoltán sustained a fatal head injury for which the Respondent mother has offered no credible explanation.”
Judge Schechter also entered a finding of neglect against the respondent father: “in that the child had old bruises and marks from prior injuries about which Respondent father failed to make adequate inquiry although he did notice them.” (See, order of fact-finding, dated June 29, 1995.)
On September 11, 1995, Judge Schechter issued the following dispositional order: “On consent, placement [with] CSS for up to 12 months to reside with Great mat. aunt [sic] Annette A. Both parents to enroll in and complete parenting skills training. Resp. mother to participate in psychotherapy. Resp. father to cooperate with psychiatric evaluation and to participate in any therapy which may be recommended.”
According to information provided to the court, shortly after the dispositional order was entered in the Family Court the respondent mother pleaded guilty to manslaughter in the second degree and was sentenced to time served, i.e., approximately nine months, with five years’ probation on condition that she attend and cooperate with psychiatric treatment.
On August 22, 1996, the respondent parents filed a joint petition for termination of placement pursuant to Family Court Act § 1062, alleging that they had adhered to the court orders for parenting and psychotherapy and were ready to be “good parents to the child”. (See, petition for termination of placement.) On September 9, 1996, the petitioner Administration for Children’s Services (hereinafter ACS), filed an untimely extension of placement petition pursuant to Family Court Act § 1055 (b) (i) alleging that although the parents were cooperating and planning for their child Umani, ACS still requested a 12-month extension “to give the mother and father more time to complete all court orders and CWA (ACS) mandates so that *711 we may discharge child to home at completion.”* (See, petition for extension of placement 8, dated Sept. 6, 1996.)
Based on the history of the case as well as the respondent mother’s ongoing participation in therapy, ACS requested and the court ordered Mental Health Services (MHS) evaluations of the respondents. (See, Family Ct Act § 251.) The MHS evaluations were completed and a joint hearing was commenced on both petitions on May 29, 1997.
In support of their request for an extension of placement, ACS presented the testimony of Dr. Maureen Gallagher, Ph D, formerly of the Family Court Mental Health Services, Wendy Heilbronn, CSW, from the Jewish Child Care Association, and Wanda Ochshom, the ACS caseworker. Dr. Gallagher’s recommendations were that the respondents “should continue in therapeutic treatment and on-going parenting skills training, with professionals dealing with forensic issues and denial of responsibility”, that the respondent mother “requires comprehensive services to include individual and group therapy, ongoing parenting skills training and vocational training” and that the respondent father requires ongoing services to include “individual and group psychotherapy.” (See, petitioner’s exhibit 1, MHS report of Huma K., at 6, dated Apr. 11, 1997.) She stated that her primary concern continued to be the respondent mother’s failure to accept responsibility for Zoltan’s death.
In addition to the testimony of its witnesses, ACS also offered into evidence the respondent father’s MHS report, and psychological and psychiatric screenings of the child Umani. (See, Family Ct Act §§ 1052, 1046.)
The respondent mother testified and was subjected to strenuous cross-examination by all counsel and the court. The respondent mother also presented the testimony of her treating psychiatrist, Dr. Kels Langsten, who treated her on a weekly basis for two years from September 1995, and on a monthly basis thereafter. Dr. Langsten testified that the respondent mother demonstrated appropriate concern and empathy for Umani and strongly recommended that the child be returned to her care. A compilation of his reports were admitted into evidence as respondent mother’s exhibit B. The respondent mother also introduced a letter from the Center for Comprehen *712 sive Health Practice, Inc. showing her extensive cooperation with her parenting skills program.
The respondent father presented the testimony of Dr. Kurasani, who evaluated him in 1995 and 1997 in his native language of Urdu. Dr. Kurasanf s conclusion on each evaluation was that the respondent father did not need further treatment. The respondent father did not testify.
DISCUSSION
Despite the tragic and extremely serious nature of the underlying findings against the respondent parents, the court is persuaded that they are currently able to care for the child Umani and that it is in his best interest to be returned to their care as soon as is practicable given the long separation. (Matter of Sunshine A. Y., 88 AD2d 662, supra; Matter of Ian S., 241 AD2d 981, supra.) While neither parent has admitted to personally inflicting the injury that caused Zoltan’s death, they have both taken ultimate responsibility for the child’s injuries and subsequent death. (Matter of C. Children, 247 AD2d 211 [1st Dept, Feb. 3, 1998].)
In reaching this decision, the court is bound by the finding made by Judge Schechter that Zoltán sustained a fatal head injury while in the mother’s care. Yet the Presentment Agency now demands an admission to murder from the respondent mother prior to even considering reunification based upon its belief that the mother is in “denial”. It would be improper to “retry” the underlying abuse case and make a finding that the mother intentionally murdered the child Zoltán.
Both the Administration for Children’s Services and the Family Court have an obligation to reunify families. (Family Ct Act § 1055 [c]; Social Services Law § 384-b [1] [a] [ii], [iii]; § 423 [1] [e]; 18 NYCRR 428.6 [b] [6] [i] et seq.) To accept the Agency’s position that the mother must now both admit to intentionally killing the child and participate in “denial therapy” would effectively preclude reunification regardless of the extraordinary progress the respondents have made. Such a position is improper given the existing findings in Family and Criminal Courts, and unreasonably coercive given the incentive of reunification.
The court is satisfied that both respondents accept responsibility for Zoltan’s death, recognize the grossly inadequate parenting that caused it, and have successfully dealt with their deficiencies as parents to the extent that they no longer pose a danger to Umani.
*713 The court has reached this conclusion after evaluating the respondent mother’s testimony and weighing the conflicting psychiatric evidence presented by Dr. Gallagher and Drs. Langsten and Kurasani. (Matter of Nassar v Santmire, 99 AD2d 377 [4th Dept 1984].) On balance, the court was much more impressed with the testimony of the respondents’ experts than the testimony of the MHS clinician. As the trier of fact, the court is entitled to reject the recommendations of the court-appointed expert in favor of the recommendations offered by the other psychiatric witness. (Rentschler v Rentschler, 204 AD2d 60, lv dismissed 84 NY2d 1027 [1995]; see also, Edgerly v Moore, 232 AD2d 214 [1st Dept 1996]; Chait v Chait, 215 AD2d 238 [1st Dept 1995]; Matter of Rebecca B., 204 AD2d 57, lv denied 84 NY2d 808 [1994].)
Dr. Gallagher interviewed each respondent on only a single occasion for two hours. Her written report includes factual misstatements that she clearly relied on in reaching her conclusion (see, Edgerly v Moore, supra), including a supposition that the child Umani was extensively bruised and scarred when he was removed from the parents. On the contrary, the medical records admitted into evidence during the original trial show no such injuries to Umani.
Likewise, based on her misperception of the Family Court finding and the Criminal Court plea, Dr. Gallagher concluded that the mother was “a self absorbed adult female who takes no responsibility for her actions” (see, petitioner’s exhibit 1, at 5). That conclusion ignores the respondent mother’s repeated acknowledgment that the child died while in her care and that she is responsible for his death. Her current refusal to admit beating him to death is not inconsistent nor is it a recent rationalization since neither the Family Court nor the Criminal Court ever made an affirmative finding that the respondent mother beat the child to death.
In comparison, Dr. Langsten has treated the respondent mother for more than two years on an extremely intensive basis. The depth and insight of his written reports and oral testimony convince this court that he has a much better understanding of the underlying events and of the respondent mother’s current psychological state and parenting abilities. (Rentschler v Rentschler, supra.)
Moreover, Dr. Langsten is not a “hired gun” retained by the mother to give a one-sided report. The respondent mother was referred to him by the New York City Probation Department as a condition of her parole on the criminal court matter.
*714 Dr. Langsten is a licensed psychiatrist who testified that he works with many parolees who are not as cooperative with treatment and not as committed to the process of therapy as the respondent mother. He testified that part of his treatment protocol includes techniques to “trip up” parolees who are in denial regarding the crime they are charged with committing. This technique is successful with most of his patients, but notably unsuccessful with the respondent mother, a finding that led him to testify with conviction that the respondent mother was not in denial.
Certainly, the court would be concerned if today the respondent mother denied causing the child’s death after admitting to killing him three years ago. The situation is not so clear-cut, however, and Dr. Langsten recognizes that the respondent mother’s statements and actions are legitimate expressions of remorse and guilt, not mere rationalizations.
Likewise, the court finds that Dr. Kurasani has an equally astute understanding of the respondent father’s situation, including the cultural factors that discourage him from openly discussing his son’s death. Dr. Kurasani conducted both evaluations of the father in Urdu, the father’s native language, while Dr. Gallagher interviewed him in English. Although the father indeed speaks some limited English, it is clear to this court from its own observations that the father is significantly more comfortable in Urdu. The court was disturbed by Dr. Gallagher’s cavalier attitude regarding the language barrier and is not confident that she was able to formulate an accurate assessment of the father given that impediment. (Lau v Nichols, 414 US 563 [1974]; see also, American Psychological Association Guidelines for Child Custody Evaluations in Divorce Proceedings, part II, § 6 [1994].)
In addition to the expert opinions, the court also relies heavily on the respondent mother’s testimony in reaching its findings. The mother testified in a forthright and credible manner regarding the events surrounding Zoltan’s death, her acceptance of responsibility for that devastating event and her extraordinary efforts in rebuilding her life. (Compare, Matter of Tanya M., 207 AD2d 656 [1st Dept 1994].) She has actively participated in intensive psychotherapy with a reputable and capable doctor, and completed 102 hours of parenting classes and at least 35 hours of marriage counseling. She has maintained steady employment since her release from incarceration and participated in GED classes to further her education. She has preserved her marriage despite Zoltan’s death and her *715 incarceration and has shown her commitment to Umani by directing her energies at his return rather than by having another child, which is a disturbing albeit common phenomenon in child abuse and neglect cases.
Moreover, Umani’s foster care placement has been less than ideal. He was initially placed with a relative who exploited the situation by requiring the parents to pay her in exchange for visitation with the child. The psychological and psychiatric evaluations conducted after he was removed from the relative’s home identify Umani as a “non-talkative, willful and stubborn little boy” notable for his “quietness and shyness”. (See, petitioner’s exhibit 3.) The psychological screening concluded that the “[floster mother will require support and counseling towards managing this boy’s difficult behavior. Special intervention may prove necessary.” (See, petitioner’s exhibit 3, psychological screening, at 2.)
While some of Umani’s problems are undoubtedly attributable to his brother’s death and his knowledge that his mother was incarcerated because of that death, foster care has clearly not met all of Umani’s emotional needs. The testimony is uncontroverted that Umani loves his parents and wants to be with them. His confusion and fear are understandable and will only be successfully addressed if his parents are involved. Fortunately, the court believes that the healing process can safely occur while Umani is in his parents’ care. (Matter of Sunshine A. Y., 88 AD2d 662, supra.)
Based on the foregoing, placement of Umani K. is extended through September 10, 1998 on the condition that ACS commence weekly unsupervised visits by April 1, 1998 and unsupervised weekend visits by May 15, 1998, both of which are necessary to encourage and strengthen the parental relationship. (Family Ct Act § 1055 [c].) Thereafter, a trial discharge shall be implemented by July 20, 1998.

 On September 8, 1997, while the hearing on the first extension petition was pending, ACS filed an additional extension of placement petition alleging the need for another 12-month placement so that the respondent could complete the recommendations of the Mental Health Services Psychologist Dr. Maureen Gallagher.