Kimberly ADAMS and Leverne
E. Adams, Jr., Plaintiffs,

v.

MONROE COUNTY DEPARTMENT OF
SOCIAL SERVICES, and New York
State Department of Social Services, De-
fendants.

No. 97–CV–6242L.

United States District Court,
W.D. New York.

Sept. 29, 1998.

Gerald Manioci, Penfield, NY, for Kimber-
ly Adams, Leverne E. Adams, Jr.

John P. Costello, Rochester, NY, for Monroe County Dept. of Social Services.

Emil· J. Bove, Office of New York State, Atty. Gen., Rochester, NY, Mary H. Doyle, New York State Atty. Gen's. Office, Dept. of Law, Rochester, NY, for New York State of Social Services.

## DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiffs, Kimberly Adams ("Mrs.Adams") and LeVerne E. Adams, Jr. ("Mr.Adams"), commenced this action under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* The complaint asserts one cause of action under the ADA against two defendants: the Monroe County Department of Social Services ("MCDSS" or "the county") and the New York State Department of Social Services ("NYSDSS" or "the state"). The county has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The state has moved to dismiss the complaint pursuant to Rule 12(b)(6).

## FACTUAL BACKGROUND

The complaint alleges the following facts. Mrs. Adams is a blind person.[1] She and Mr. Adams have a son who was born to them in 1983. In early 1993, plaintiffs decided that they would like to adopt a child, so they contacted MCDSS for assistance. In March 1993, plaintiffs enrolled in MCDSS's "Model Approaches to Partnership and Parenting" ("MAPP") classes to make them eligible to adopt. They successfully completed the MAPP classes in May 1993.

Plaintiffs allege that in April 1993, they expanded their interests beyond adoption to include becoming foster parents, which often involves children with behavioral problems or other special needs. The county contends that plaintiffs did not communicate this interest to MCDSS until May 1994.

After completing the MAPP classes, plaintiffs began contacting MCDSS once a week to see if it had a child available for them. Every week the answer was negative.

On June 1, 1994, Mrs. Adams met with Mary Lou Miller and Laurie Bosso, who were respectively a Home Finding Supervisor and a Home Finding Caseworker at MCDSS. According to the complaint, Miller allegedly told Mrs. Adams that because of her blindness, no foster children would be placed in her home.

A transcript of that meeting,[2] however, shows that Miller did not flatly state that the Adamses would not be considered for foster care. At one point, Miller told Mrs. Adams that MCDSS had been looking for foster parents for a certain four-year-old boy and that Mrs. Adams was not considered because the child was "extremely active," and that "with your handicap and your sight limitations it would be very difficult to supervise a child like that." Affidavit of Kimberly Adams (Item 16), Ex. G at 4. She added:

I think we know from learing [sic] in the past before, that is [sic] has taken two parents to supervise this child. And I think you would have great concern, I would personally, and I think also from a liability standpoint as far as your [sic] concerned. If something should happen to that child, on any day, you would be liable, we would be liable and I dont [sic] think we want—I know we don't want to put you in that position—and we certainly don't want to put ourselves in that position.

*Id.* at 4–5. Miller went on to explain that unlike an adopted child, a foster child "will still be returning home to its bio[logical] parents," who remain "very much involved" in the care of the child. *Id.* at 5. As an example, she also stated that another woman who walked with a cane and could not walk very fast was not able to adequately supervise a very active child, adding that "we have

---

1. Although the parties agree that Mrs. Adams is blind, the complaint alleges only that she has been "visually handicapped ... since 1982, when one of her retinas became detached." Complaint ¶ 6.

2. Mrs. Miller secretly tape-recorded the meeting. Affidavit of Kimberly Adams (Item 16), Ex. G at 48. Unfortunately, the tape ran out before the end of the meeting so what was said by the participants at the end of the meeting was not transcribed.

to think of what that childs [sic] needs are." *Id.*

Mrs. Adams then pointed out that her husband would also be available to supervise the child. In response, Miller expressed concern because Mr. Adams would be gone for long periods of time. Mrs. Adams stated that Mr. Adams worked at one job from 3:00 p.m. to 11:30 p.m. (presumably five days a week), and at a second job from 9:00 a.m. until 1:00 p.m. one day a week, and from 11:00 p.m. to 7:00 a.m. on Sunday nights. *Id.* at 6.

Miller also stated, "I think particularly there may be a child who is freed for adoption, the liability issue would not be a concern. Because I see you've done a very good job with your own child." But, she added, children coming into foster care are often difficult to handle and require special attention, which a blind person might not be able adequately to provide. *Id.* at 8. Plaintiff then conceded that she "would not accept a child in my home that would start fires. I could not handle a child personally that is in a wheelchair, or has seizures." She maintained, though, that she would be able to handle many other types of children. *Id.* at 9.

In response, Miller stated that she remained concerned about liability issues, particularly when a child would be outdoors. For example, she stated, if Mrs. Adams took her son and foster child to a playground, and the foster child fell off a swing, plaintiff might not be aware of it immediately and could be liable to the biological parents. *Id.* She also stated that because many of the children in foster care had disciplinary problems, some of them "learn to take advantage of your lack of sight" and would try to "see how much else they could get away with." *Id.* at 10.

On August 1, 1994, plaintiff retained an attorney (who no longer represents her), who wrote MCDSS a letter alleging a violation of the ADA. The record does not contain any response from MCDSS to this allegation. Relatively soon thereafter, however, on October 31, 1994, plaintiffs learned that an infant child would become available to them for adoption through a private agency. Adams Aff. Ex. E at 54. At Mrs. Adams' deposition, she admitted telling MCDSS during November 1994 that she was pursuing private adoption by taking a newborn infant at birth. In fact, the plaintiffs allowed the child's natural mother to live with them in January 1995 during her pregnancy. The child was born on February 25, 1995, and plaintiffs adopted it shortly thereafter. In March 1995, plaintiffs told MCDSS that they were no longer interested in either adoption or foster care from MCDSS because of the adoption of their infant son. At some point after that, plaintiffs also moved out of Monroe County. Plaintiffs testified at their depositions that they moved to Farmington, in Wayne County, New York, in June 1996, and returned to Monroe County around April 1997. Adams Aff. Ex. E at 4–5, 86.

On April 6, 1995, plaintiffs also filed an administrative complaint with the United States Department of Health & Human Services. The Office for Civil Rights ("OCR") investigated the complaint and, on May 16, 1997, issued a decision finding that MCDSS had not violated any federal laws or regulations. Affidavit of Emil J. Bove, Jr. (Item 17), Ex. B.

Plaintiffs commenced the instant action on May 27, 1997. The complaint contains one count alleging that Mrs. Adams's blindness was a *motivating factor* in the decision to deny plaintiffs a foster or adopted child, and that plaintiffs' rights under the ADA were therefore violated. Plaintiffs request declaratory and injunctive relief, and ask the court to "[a]ward them placement of a foster or adoptive child in their home ..." Plaintiffs also seek $500,000 in "liquidated damages," an unspecified amount of damages for emotional distress and mental anguish, punitive damages, and attorney's fees and costs.

## DISCUSSION

### I. The State's Motion

The state has moved to dismiss the complaint for failure to state a cause of action upon which relief can be granted. The state contends that: NYSDSS is not a "covered entity" under the ADA; MCDSS is not an agent of NYSDSS; plaintiffs are not "quali-

fied individuals" under the ADA; and plaintiffs have alleged no facts to support a claim against the state.

■ I agree with the state that the complaint must be dismissed as to NYSDSS because of the complete lack of any factual allegations against it. The *only* mentions of NYSDSS in the complaint are contained in the descriptions of the parties. NYSDSS is identified as an agency of New York State, and MCDSS as "an agent existing and operating under the auspices of [NYSDSS] ... [that] has separate independent [legal] status from defendant" NYSDSS. Complaint ¶¶ 5, 6 (third brackets in original). NYSDSS is not alleged to have had anything to do with the matters giving rise to this action whatsoever. In short, there is no basis for the claim against NYSDSS.

In response to the state's motion, plaintiff's attorney has submitted an affirmation stating:

> Defendant NYSDSS's involvement in the discrimination was both direct and indirect. It was indirect in that MCDSS would not exist without NYSDSS and is dependent upon it for its policies and procedures which must be both legal and followed in accordance with applicable law. It is direct in that they were consulted at some point in this process, and had input.

Affirmation of Gerald Manioci (Item 24) ¶ 6.

None of those assertions provide a basis for plaintiffs' claim against the state, however. The mere fact that MCDSS follows regulations and policies promulgated by the state is of no significance, absent some allegation that those regulations or policies are themselves violative of the ADA. Plaintiffs here have made no such assertion; in fact, plaintiff's attorney seems to assert that had state regulations been followed here, MCDSS would have allowed plaintiffs to adopt or become foster parents. *See* Manioci Affirmation ¶ 4. In addition, Mrs. Adams testified at her deposition that the only people she dealt with in this matter worked for MCDSS, not NYSDSS. Adams Aff. Ex. E at 63–66.

Moreover, the relevant regulation, 18 N.Y.C.R.R. § 444.5(a)(2), simply provides that "physical handicaps or illness of foster parents ... shall be a consideration only as they affect the ability to provide adequate care to foster children or may affect an individual child's adjustment to the foster family." That is not a state-provided license to discriminate against persons with physical handicaps, but a reasonable regulation intended to ensure the health and safety of foster children, and it is not inconsistent with the ADA.

■ Plaintiffs' attorney's statement about the state's alleged direct involvement in the county's actions is also insufficient to defeat the state's motion. For one thing, "[a]n affidavit of the opposing party's attorney which does not contain specific facts or is not based on first-hand knowledge is not entitled to any weight." *Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983). Secondly, this allegation is not contained in the complaint, and even if it were, the statement that NYSDSS was "consulted at some point in this process, and had input" is so vague that the State would not be able to frame a meaningful response, and the allegation therefore would not meet the requirements of Rule 8 of the Federal Rules of Civil Procedure.[3]

## II. The County's Motion

In support of its motion for summary judgment, the county contends that there is no evidence of discrimination in this case, and that plaintiffs' request for injunctive relief is moot. The county also asserts that neither compensatory nor punitive damages are available in this action.

■ After reviewing the record, I agree with the county that plaintiffs have not demonstrated the existence of a genuine issue of material fact regarding whether Mrs. Adams was discriminated against, and that the complaint must therefore be dismissed. Al-

---

**3.** The state also asserts that plaintiffs cannot establish that NYSDSS is a covered entity under the ADA, that Mrs. Adams is a qualified individual under the ADA, or that she was subjected to unlawful discrimination. Although my ruling that plaintiffs have not stated a claim against the state renders it unnecessary for me to address those issues with respect to the state's motion, they are addressed to the extent that they are relevant to the county's motion.

though the evidence shows that there was concern about Mrs. Adams' blindness, there was no final, conclusive decision that she could not under any circumstance be considered. Rather, it appears that plaintiffs abandoned the process once they received a child through private adoption. In fact, the record shows that MCDSS attempted to pursue the foster-parent process with plaintiffs, and that it was plaintiffs themselves who eventually put an end to that process. On October 7, 1994, MCDSS sent plaintiffs a letter along with the profile forms that plaintiffs had filled out previously. The letter stated that the forms indicated that plaintiffs were interested only in adoption, and that since plaintiffs had now expressed an interest in becoming foster parents as well, MCDSS needed to have the forms updated. The letter stated that once plaintiffs had returned the updated forms, MCDSS would set up a meeting with plaintiffs to discuss their current interests. Adams Aff. Ex. I. Plaintiffs do not deny the county's assertion that MCDSS sent a follow-up letter to them in November 1994 because plaintiffs had not yet returned the forms. Plaintiffs did then return the forms later that month, with notations indicating their interest in foster care.

A meeting was then scheduled for sometime in December 1994, but it was postponed because plaintiffs' then-attorney was unavailable. Mrs. Adams testified that the meeting was rescheduled for March 1995, but that she "canceled the meeting because [she] just had a brand new baby [through a private adoption] and [she] needed to give him all [her] attention." Adams Aff. Ex. E at 58–59. Mrs. Adams also told MCDSS that plaintiffs were not interested in becoming foster parents at that time. There is no evidence, then, that MCDSS dragged its feet in this matter or otherwise sought to thwart plaintiffs' attempt to become foster parents. Rather, it was plaintiffs themselves who ultimately ended the process.

Although plaintiffs contend that they are now once again desirous of becoming foster parents, there is also no evidence that they ever communicated that fact to MCDSS. As stated, they not only told MCDSS that they were not interested in taking in a foster child

in 1995, but they moved out of the county in 1996 and did not return until about a month before filing this lawsuit in May, 1997. There is no evidence that plaintiffs informed MCDSS either that they had moved back to Monroe County or that they wished to resume their attempt to become foster parents. In short, the evidence indicates not so much a conscious decision on the part of MCDSS not to consider plaintiffs as potential foster parents, but rather an eventual curtailing of the process by plaintiffs themselves.

I also note that plaintiffs have presented no evidence concerning how many or what types of children MCDSS did place in foster care during the brief period during which plaintiffs sought a foster child. Presumably MCDSS maintains records of which children it has placed, or attempted to place, into foster homes. Plaintiffs have failed to show that any particular children that MCDSS placed into foster care with other families met plaintiffs' criteria for foster children they were willing to accept, much less that those children were not placed with plaintiffs because of Mrs. Adams's blindness.

It should also be noted that plaintiffs were not willing to accept just *any* child. Mrs. Adams told Miller that she was looking for a child younger than her son, who was eleven at the time of the June 1, 1994 meeting between Mrs. Adams, Miller and Bosso. Adams Aff. Ex. G at 16. The Personal Profile forms that plaintiffs submitted to MCDSS also stated that the plaintiffs wanted a white child. Adams Aff. Ex. A. As Miller explained to Mrs. Adams at their meeting, however, relatively few of the children for whom foster homes were needed were white, and many of the children were teenagers. Adams Aff. Ex. G at 11. Plaintiffs do not dispute these assertions. Thus, there is no evidence that children fitting the description of what plaintiffs were looking for routinely became available and that plaintiffs were just as routinely excluded from consideration because of Mrs. Adams's blindness.

 On the merits, to the extent that Mrs. Adams's blindness was taken into consideration by MCDSS in determining whether she would be a fit adoptive or foster parent, I believe it was a legitimate consider-

ation and that such a consideration did not amount to unlawful discrimination in violation of the ADA. Although there appears to be virtually no recorded case law addressing the applicability of the ADA to government-sponsored adoption programs, certain general principles are relevant to this case. First, to establish a prima facie case under the ADA, a plaintiff must show that: (1) she has a disability; (2) she is a qualified individual; and (3) she was discriminated against because of the disability. 42 U.S.C. § 12132; *Swain v. Hillsborough County School Bd.*, 146 F.3d 855, 856 (11th Cir.1998). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Although there is some dispute about whether the Adamses were ever certified to become foster parents, for purposes of this motion I will accept plaintiffs' contention that they were.[4] I therefore assume *arguendo* that Mrs. Adams is a qualified individual with a disability with respect to her claims here.

All that the record reveals, however, is that MCDSS had legitimate concerns about plaintiff's blindness possibly interfering with her ability to safely supervise many of the children for whom foster homes were needed. The record does not indicate that MCDSS ever flatly refused even to consider putting a foster child in the Adamses' home. All that the evidence shows is that MCDSS made decisions in this regard on a case-by-case basis, attempting to find a suitable home for each child, and that in the judgment of MCDSS, plaintiffs' home was not suitable for the individual children whom MCDSS was attempting to place at that time.

A vast body of case law from New York state courts shows that in matters involving adoption or foster care, it is the child's best interests that are paramount. *See, e.g., Commitment of Vanessa R.*, 671 N.Y.S.2d 232 (1st Dep't 1998); *Matter of Baby Boy P.*, 244 A.D.2d 491, 664 N.Y.S.2d 340 (2d Dep't 1997); *Elizabeth YY v. Albany County Dept. of Social Servs.*, 229 A.D.2d 618, 644 N.Y.S.2d 856 (3d Dep't 1996); *Matter of Ian S.*, 241 A.D.2d 981, 661 N.Y.S.2d 376 (4th Dep't 1997); *Matter of Umani K.*, 176 Misc.2d 708, 673 N.Y.S.2d 877, 878 (N.Y.City Fam.Ct.1998). Thus, MCDSS's role here was not to find a child for plaintiffs' home, but the opposite: to find suitable homes for children. In doing so, MCDSS's determination that it would not be in the available children's best interests to be placed in plaintiffs' home because of the risk of physical harm did not constitute unlawful discrimination.

In that regard, I note that a number of Courts of Appeals, including the Second Circuit, have held that children in state-administered foster care have a constitutional right to be reasonably safe from harm, and that state and local officials can be held liable if they fail to protect that right. *See Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 893 (10th Cir.1992); *Taylor By and Through Walker v. Ledbetter*, 818 F.2d 791, 794–97 (11th Cir.1987) (en banc), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989); *Doe v. New York City Dep't of Social Serv.*, 649 F.2d 134, 141 (2d Cir.1981), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *see also DeShaney v. Winnebago County Dep't of Social Serv.*, 489 U.S. 189, 201 n. 9, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (had child, who was in his biological father's custody when he was severely beaten by father, instead been placed in foster home by state, situation might give rise to affirmative duty to protect) (citing *Walker* and *Doe*). Surely, then, those same officials may, and indeed should, take

---

4. The parties agree that plaintiffs were certified to become adoptive parents. As to foster care, Cynthia Lewis, an administrative caseworker with MCDSS, testified at a deposition that although she had not been directly involved in plaintiffs' applications to become adoptive or fos-
ter parents, she had reviewed their file. She stated that plaintiffs were certified for both adoptive and foster care. Adams Aff. Ex. E at 143. Bosso testified that to the best of her knowledge, plaintiffs had been certified only to adopt. *Id.* at 109.

into account a prospective foster parent's disability that could put a foster child in greater risk of harm.

I also note the OCR's findings that none of defendants' actions, policies or regulations in this case violated plaintiffs' rights under the ADA. Although not binding on this court, those findings are entitled to some weight. *See Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir.1985) (finding of probable cause by administrative agency, such as the EEOC, though not determinative, is admissible to help establish prima facie case in Title VII case), *aff'd*, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986); *Dundas v. Convalescent Hosp. for Children*, No. 92–CV–6005L, 1995 WL 813721 *5 (W.D.N.Y. Mar. 9, 1995). I concur with the OCR's conclusion the policies and procedures used here "were applied in a nondiscriminatory manner and are in compliance with the ... ADA regulations with respect to the issues investigated." Bove Aff. Ex. B at 5.

In short, then, all that the evidence shows is that MCDSS was legitimately concerned about placing a foster child, many of whom have greater needs than most children, in plaintiffs' home, where, for much of the time, the child would be in the care of Mrs. Adams, who would be unable to see the child. This concern involved not only considerations of legal liability to the child's biological parents, but the safety of the child as well. Certainly, the safety of the children was of paramount concern and this Court should afford some deference to agencies charged with such an important task. This decision should also not be read as intending any criticism of plaintiffs. It appears that plaintiffs are capably raising their own two sons. In my judgment, in light of the record here, it was not unreasonable for MCDSS to be wary of placing certain children in Mrs. Adams' care in light of her admitted blindness.

As stated previously, the complaint, though containing only one count alleging discrimination in violation of the ADA, in that count there is reference to retaliation as well. The complaint states that in November 1994, MCDSS told plaintiffs that it would not update plaintiffs' files or give them certain forms that plaintiffs had requested until plaintiffs' charges of discrimination were settled. The complaint also alleges that plaintiffs' Home Finding Unit card was removed from their file, which prevented them from being considered as adoptive or foster parents.

Plaintiffs have come forward with no evidence to support these allegations. To the contrary, the record shows that in November 1994, MCDSS was attempting to update plaintiffs' records, after which a meeting was to be scheduled to discuss plaintiffs' wishes. As stated, it was plaintiffs who ultimately scuttled those plans, a few months later when they received a child through a private agency.

In addition, when asked at her deposition what acts of retaliation she believed that MCDSS had committed toward her, Mrs. Adams stated, "by allowing me to go through the classes and making me wait for a year and then to sit at my table and tell me I can't because I'm blind. I mean, they just led me on." Adams Aff. Ex. E at 60. When her own attorney then tried to clarify the question, she stated, "They didn't do anything accept [sic] turn everything around." *Id.* at 61. Thus, Mrs. Adams herself did not testify about any problems concerning plaintiffs' files of the Home Finding Unit card.

## CONCLUSION

Defendant Monroe County Department of Social Services' motion for summary judgment (Item 9) is granted. Defendant New York State Department of Social Services' motion to dismiss the complaint (Item 17) is granted. The complaint is dismissed as to both defendants.[5]

IT IS SO ORDERED.

---

5. My finding that the complaint must be dismissed on the merits renders it unnecessary for

me to rule on the county's contentions that plaintiffs' request for injunctive relief is moot, and that punitive and compensatory damages are unavailable in this action.