Cherif SADKI, Plaintiff,

v.

SUNY COLLEGE AT BROCKPORT,
Defendant.

No. 99–CV–6607L.

United States District Court,
W.D. New York.

Feb. 18, 2004.

Cherif Sadki, Rochester, NY, Pro se.

Kelly Ann McCarthy, Office of the New York State Attorney General, Rochester, NY, for Defendant.

## DECISION AND ORDER

LARIMER, District Judge.

Plaintiff, Cherif Sadki, appearing *pro se,* commenced this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff, a native of Algeria, is a practicing Muslim and a mem-

ber of the Berber ethnic group. In 1998, while he was employed as a visiting professor at defendant SUNY College at Brockport ("Brockport"), plaintiff unsuccessfully applied for an assistant professor position in Brockport's Foreign Languages Department ("the department"). Plaintiff alleges that the reason that he was not offered that position is that Dr. Patricia Siegel, the then-acting chair of the department, who allegedly had some input into the decision-making process, harbored discriminatory animus toward plaintiff on account of his race, national origin, and religion. Defendant has now moved for summary judgment.

## FACTUAL BACKGROUND

Plaintiff, who speaks both English and French, received a bachelors degree in education from Algiers University in 1981, and a Ph.D. (with concentrations in African studies, comparative education, international studies, and sociology of education) from the State University of New York at Buffalo in 1994. McLean Decl. (Docket # 35), Ex. B. Plaintiff was a lecturer at Brockport from 1990 until 1993, and a visiting professor beginning in September 1995. While he was a visiting professor, plaintiff taught four French courses per semester. Sadki Decl. (Docket # 43) ¶ 4.

During the 1997–98 academic year, the department conducted a search to fill the position of Assistant Professor of Foreign Languages/French ("the position"). McLean Decl. ¶ 3. A search committee ("the committee"), made up of members of the department and one student, was formed to screen and interview candidates, and to make a recommendation to the Dean of the School of Letters and Sciences, Robert J. McLean,[1] as to who should be hired to fill the position. McLean, who was not bound

by the committee's recommendation, McClean Decl. ¶ 4, would in turn advise Brockport's President, Paul Yu, which candidate McLean believed should be hired. According to defendants, Yu made the final decision on whom to hire. McLean Reply Decl. (Docket # 46) ¶ 15.

Prior to the commencement of the search, Dr. Elaine Miller, the then-chair of the department, submitted to McLean a written Request for Authorization to Search ("search authorization"). The requirements set forth in the search authorization were:

Ph.D. or equivalent in French/Francophone Studies or related area. Experience in teaching language. Commitment to teach language, civilization, and literature to undergraduate students. Familiarity with multimedia applications. Demonstrated ability to conduct and publish scholarly research. Capacity to function effectively in a culturally diverse environment.

McLean Decl. Ex. A.

According to McLean, plaintiff did not meet these criteria, because his Ph.D. was not in "French/Francophone Studies or [a] related area," but rather in education and other non-French-related areas. McLean also describes plaintiff's scholarship and research as "minimal." McLean Decl. ¶ 8.

McLean adds that he "knew that Dr. Sadki was well-liked in the Department," and that "there would be many in the Department who would want to hire him for the French position." McLean Decl. ¶ 6. He states that he was therefore "surprised when [he] received the Department's Search Authorization because Dr. Sadki did not meet the basic, minimum qualifications for the job as described by the Department." McLean Decl. ¶ 7. He

1. McLean has since retired. McClean Decl. ¶ 1.

states that "[t]ypically, when a position is available and an academic department knows of a person they would like to hire to fill the position, but they are required to conduct a search, they will tailor the hiring criteria to fit the desired candidate." McLean Decl. ¶ 9.

In a memorandum dated February 11, 1998, the committee informed McLean that it had chosen four candidates to invite for on-campus interviews: Sadki, Giles Carjuzza, Mary Beth Vogl, and Donna Wilkerson. McLean Decl. Ex. C. As part of the interview process, McLean met with each candidate. McLean states that in accordance with his usual practice, after he had spoken with all four candidates, and before receiving the committee's recommendation, McLean ranked the candidates. According to McLean, his rankings, from highest to lowest, were: Wilkerson, Vogl, Carjuzza, and Sadki. McLean Decl. ¶ 14.

In early March 1998, the committee sent its written recommendations to McLean. Although the committee did not expressly rank the candidates, it is clear that they preferred Sadki over the other three. Their comments about Sadki included the following: "Dr. Sadki has demonstrated excellence in teaching as well as outstanding service to the department, the college, and the community"; "[s]tudent evaluation of his teaching ranges from very good to excellent"; "[p]eer evaluations through classroom observations are also extremely favorable"; and a number of other very positive, if not glowing, assessments of Sadki's abilities. McLean Decl. Ex. D.

The only negative comment made by the committee about Sadki was that his "accomplishments in scholarship have not been strong up to this point." The committee suggested, however, that this was understandable in light of the facts that Sadki had only recently received his Ph.D., and that he had been teaching four courses

per semester since September 1995. The committee also noted that Sadki was working on a book on African education, and added that "[h]is expertise in French/Francophone literature and culture will enable him to carry out relevant research in those areas." At any rate, the committee clearly did not consider Sadki's limited research up to that point to be a serious problem or impediment to his candidacy, since it concluded that he would be "a perfect fit" for the department.

The committee also indicated that it considered Wilkerson to be an acceptable candidate. It stated that although Wilkerson had not yet received her Ph.D. in French, she was scheduled to defend her dissertation in June 1998. Otherwise, the committee's comments about her were favorable, and the committee concluded that she "would be a good fit" for the department, but the overall tone of the memorandum suggests, and indeed defendant does not deny, that the committee's first choice for the position was Sadki.

The committee's recommendations notwithstanding, McLean states that he remained convinced that Sadki did not meet the minimum requirements for the position. In reaching that conclusion, he states that he was also influenced by a conversation that he had with President Yu earlier that year in which Yu stressed the importance to him of making high-quality faculty appointments. McLean states that he knew that Sadki "was not the kind of appointment President Yu would want to make" because of Sadki's lack of qualifications for the position. McLean Decl. ¶ 19.

McLean states that he "knew that the members of the Search Committee would not be pleased with a decision not to hire Dr. Sadki," however, McLean Decl. ¶ 19, so he decided to obtain input from two other deans and an associate dean at

Brockport. He gave each of them Sadki's and Wilkerson's curricula vitae ("CVs") as well as the position criteria and requirements, and asked for their opinions. McLean states that all three deans thought that Wilkerson was qualified, but that Sadki was not. McLean Decl. ¶ 20.

McLean also states that "[a]t some time," though he does not say exactly when, he "did become aware that Dr. Siegel shared [McLean's] opinion that Dr. Sadki did not meet the minimum qualifications for the French position." McLean Decl. ¶ 24. McLean states, however, that Siegel never said anything to him about Sadki's race, religion or national origin, that McLean had already ranked the candidates (with Sadki lowest) when he talked with Siegel, and that her assessment of Sadki had no impact on McLean's decision not to recommend to President Yu that Sadki be chosen for the position. McLean Decl. ¶¶ 25, 26.

In a memorandum dated March 6, 1998, McLean recommended to President Yu that Wilkerson be chosen for the position. McLean Decl. Ex. F. Along with the memo, McLean sent Yu the committee's recommendations, and Sadki's and Wilkerson's CVs. He stated that "[t]he department met with [McLean on March 6] to express their strong support for Sadki," who was "their top choice." McLean added, "My problem [with Sadki] is that I don't believe he meets the minimum qualifications according to their initial screening checklist." McLean also told Yu that the other deans whose opinions he had solicited thought that Wilkerson, but not Sadki, was qualified for the position. McLean said that "[t]he department made

arguments that Sadki did meet the qualifications, by extended interpretation of the requirements, although some admitted that he would have rated in the "C" category if they did not know him." [2] McLean concluded, "I remain unconvinced that he should be offered the position." After reading McLean's comments, President Yu hand-wrote, "I agree with your analysis" at the bottom.

Wilkerson was then offered the position, which she accepted. At some point thereafter, Sadki left his employment at Brockport.

Plaintiff filed a complaint against Brockport with the New York State Division of Human Rights ("DHR") on April 3, 1998, alleging that he had been discriminated against on account of his age, creed, national origin and sex. After investigation, the DHR issued a determination on May 19, 1999, in which it concluded that there was probable cause to believe that Brockport "engaged in or is engaging in the unlawful discriminatory practice complained of." [3]

It appears, however, that the DHR actually found probable cause only with respect to plaintiff's allegations of discrimination on the basis of his national origin and creed. Attached to the probable-cause finding was a DHR internal memorandum entitled "Final Investigation Report and Basis of Determination," ("report") dated April 22, 1999, in which the DHR investigator concluded that "[t]here [wa]s sufficient evidence to support the complainant's allegations that he was not hired for the position because of his na-

---

**2.** The exact parameters of this alphabetical ranking system are not clear from the record, but the committee's February 11, 1998 memo to McLean refers to "ABC lists of applicants," and states that the four candidates who had been selected for interviews (including plain-

tiff) were all "A" candidates. McLean Decl. Ex. C.

**3.** The DHR's decision is attached to the complaint in this action.

tional origin and creed." Report at 4. The investigator found insufficient evidence to support Sadki's allegations of age and sex discrimination, however. Report at 2.

In support of this determination, the investigator cited several pieces of evidence. He stated that other members of the department supported Sadki's allegation that "Ms. Siegel had greeted the complainant using a racially insensitive term at a department event." *Id.* This was an apparent reference to Sadki's allegation that on one occasion, Siegel had called out to plaintiff, "Hey, you the Moroccan." *See* Letter from plaintiff to DHR dated July 2, 1998 (attached to complaint in this action) at 3, ¶ 5. Another person told the investigator that she had gone with Sadki to Brockport's affirmative-action director regarding this comment, "as well as other inappropriate comments that students had reported were made to them about [Sadki] by Ms. Siegel." Report at 2.

The report also states that another department member "asserted that they were of the impression that Ms. Siegel had problems working with people from other countries, especially Islamic ones. This individual asserted that although Ms. Siegel runs the cross cultural program, she is not a very cross cultural person." *Id.*

The investigator also expressed doubt about Brockport's assertion that Sadki was not qualified for the position. He noted that the committee "felt very strongly that [Sadki] was the best qualified candidate for the position." *Id.*

The report also states that although Sadki did not allege that McLean intentionally discriminated against him, Siegel, who opposed Sadki's candidacy, "discussed her viewpoint with Dean McLean and clearly had input into the decision." Report at 3. The investigator stated, "In fact, as the Acting Chair of the department, and as one of only two other professors who

taught French ..., considerable deference to her opinion would be expected. However, because of the issues of Ms. Siegel's alleged hostility to [Sadki], based on his ethnicity, such input is tainted by discriminatory animus." *Id.*

The investigator also found it "interesting to note that while Mr. McLean and Ms. Siegel emphasize [Sadki's] alleged lack of an appropriate degree, ... neither of the committee members interviewed recall the degree issue being raised in their meeting with Mr. McLean regarding his concerns about [Sadki's] inadequacy," and that although McLean did discuss Sadki's lack of publications with the committee members, Sadki's "degree was not raised [by McLean] as a reason for not selecting" Sadki, which suggested that the issue about the degree might have been an afterthought on McLean's part. *Id.* The investigator also noted that the committee itself apparently considered Sadki's degree to be sufficient, since it strongly recommended him for the position. He also pointed out that Wilkerson, the person who was chosen, "did not yet have a doctorate," and that she had less teaching experience than Sadki. *Id.*

On September 13, 1999, the Equal Employment Opportunity Commission ("EEOC") issued plaintiff a right-to-sue letter. Plaintiff filed the complaint in this action on December 9, 1999.

## DISCUSSION

### I. General Standards

The standards for deciding summary judgment motions in Title VII and other discrimination actions, which require application of the three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), are well-established. *See Weinstock v. Columbia Univ.,*

224 F.3d 33, 42 (2d Cir.2000). In short, plaintiff must first make out a prima facie case of discrimination by showing that he: (1) is a member of a protected class; (2) was qualified for the position at issue; (3) was denied the position; and (4) that the circumstances of the adverse employment decision give rise to an inference of discrimination. *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir.2003). The Court of Appeals for the Second Circuit has "characterized the evidence necessary to satisfy this initial burden as 'minimal' and '*de minimis.*'" *Zimmermann v. Associates First Capital Corp.* 251 F.3d 376, 381 (2d Cir.2001) (citations omitted).

■ Once plaintiff establishes his prima facie case, defendant has the burden to come forward with a legitimate, nondiscriminatory reason for not awarding the position to the plaintiff, and the plaintiff has the ultimate burden of persuading the trier of fact that unlawful discrimination was the real reason for the denial. *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

■ To overcome a well-founded motion for summary judgment in this action, then, plaintiff must show that there exists a genuine issue of material fact concerning whether the decision to select someone other than plaintiff for the position was motivated by discrimination. Fed.R.Civ.P. 56(c); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 132 (2d Cir.), *cert. denied*, 530 U.S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000). Plaintiff can do so by presenting sufficient admissible evidence from which a rational finder of fact could infer that more likely than not he was the victim of intentional discrimination. *Bickerstaff v. Vassar College*, 196 F.3d 435, 447–48 (2d Cir. 1999), *cert. denied*, 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000). In assessing the record to determine whether plaintiff has made such a showing, the court resolves all ambiguities and draws all reasonable factual inferences in favor of plaintiff, the party opposing the motion. *Id.* at 448.

## II. Title VII and Institutions of Higher Education

■ While there can be no dispute that Title VII applies to colleges and universities no less than to other employers, *University of Pennsylvania v. EEOC*, 493 U.S. 182, 190–91, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990); *Fisher v. Vassar College*, 70 F.3d 1420, 1435 (2d Cir.1995), *reh'g in banc*, 114 F.3d 1332 (2d Cir.1997), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998),[4] "courts are also understandably wary of impinging upon the academic freedom of our institutions of higher learning, an 'important part' of which is a 'university's prerogative to determine for itself on academic grounds who may teach'" within its classrooms and lecture halls. *McFadden v. State University of New York, College at Brockport*, 195 F.Supp.2d 436, 446 (W.D.N.Y.2002).(quoting *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir.1980) (additional internal quotes omitted)). *See also Bickerstaff*, 196 F.3d at 455 (a college "alone has the right to set its own criteria for promotion and then to evaluate a candidate's fitness for promotion under them").

---

**4.** The decision in *Fisher* following the *in banc* rehearing "effectively let the panel decision on the merits stand unaltered," so the panel decision remains good law. *McFadden ·v. State University of New York, College at Brockport*, 195 F.Supp.2d 436, 446 (W.D.N.Y.2002).

(citing *Fisher*, 114 F.3d at 1347 n. 11) (directing issuance of mandate "drawing its authority from the opinion of the in banc court as to [one issue regarding the standard of appellate review], and the panel's rulings as to the disposition of all other issues in the appeal").

■ At the same time, however, the Court must remain mindful that "faculty votes should not be permitted to camouflage discrimination." *Namenwirth v. Board of Regents*, 769 F.2d 1235, 1243 (7th Cir.1985), *cert. denied*, 474 U.S. 1061, 106 S.Ct. 807, 88 L.Ed.2d 782 (1986). Judicial deference to university officials' decisions about whom to select for particular faculty positions, therefore, should not become a "policy of self-abnegation where colleges are concerned." *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1153 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). "In evaluating plaintiff's claims and defendant's motion, then, the court must strike a balance, giving proper deference to the informed, good-faith evaluations of faculty members by their peers, while at the same time leaving fully open the avenues of relief created by Congress for individuals who have been discriminated against in their employment." *McFadden*, 195 F.Supp.2d at 447.

### III. Plaintiff's Claims

■ Applying these standards to the case at bar, I find that plaintiff has established that there are material issues of fact in this case, and that defendant's motion for summary judgment must be denied. In particular, I believe that there is evidence from which the trier of fact could conclude that: Siegel harbored discriminatory animus toward plaintiff on account of his race, national origin, or religion; she had significant input into the decision whether to offer the position to plaintiff; because of her animus, Siegel recommended that plaintiff not be selected for the position; and Siegel's recommendation was a motivating factor in the ultimate decision not to offer the position to plaintiff.

In support of their motion, defendants argue that Siegel's feelings toward Sadki are essentially irrelevant, since she was not the one who decided which candidate to select; McLean made a nonbinding recommendation to President Yu, who made the final decision. There is considerable authority, however, from this circuit and others, that the element of causation-*i.e.*, that an adverse employment action was caused by discrimination-can be satisfied by showing that a person with discriminatory animus toward the plaintiff influenced the "actual" decisionmaker, even if the latter did not consciously discriminate against the plaintiff. *See, e.g., Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir.2001) (discriminatory comments of plaintiff's supervisor, who did not have formal firing authority but who "had enormous influence in the decisionmaking process," constituted direct evidence of discrimination); *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1312 (D.C.Cir.1998) ("evidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence"); *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir.2000) ("One method [of proving pretext] is to show that discriminatory comments were made by ... those in a position to influence the decisionmaker"); *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 286 (3d Cir.2001) ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate [the plaintiff] ... [because] an evaluation at any level, if based on discrimination, [may] influence[ ] the decisionmaking process and thus allow [ ] discrimination to infect the ultimate decision") (internal quotations and citation omitted); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir.2000) ("If the [plaintiff] can demonstrate that others had influence or leverage over the official decisionmaker ... it is

proper to impute their discriminatory attitudes to the formal decisionmaker"); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir.1998) ("[R]emarks by those who did not independently have the authority ... to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, [are] relevant"); *Maarouf v. Walker Mfg. Co., Div. of Tenneco Automotive, Inc.*, 210 F.3d 750, 754 (7th Cir.2000) (where discriminatory coworker, by concealing relevant information from the decisionmaking employee or feeding false information to him, is able to influence the decision concerning plaintiff, "the discriminatory motive of the other employee, not the autonomous judgment of the nondiscriminating decision-maker, is the real cause of the adverse employment action"); *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1323 (8th Cir.1994) (discriminatory remarks of a manager, who was the fired plaintiff's supervisor and who was "closely involved in employment decisions," constitute direct evidence of discrimination); *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir.2001) (manager's comment was direct evidence of retaliation because "[e]ven if [the] manager was not the ultimate decisionmaker [in denying the plaintiff a promotion], that manager's retaliatory motive may be imputed to the company if the manager was involved in the ... decision"); *Weber v. Parfums Givenchy, Inc.*, 49 F.Supp.2d 343, 361 (S.D.N.Y.1999) ("Although Frier may not have been the person who made the ultimate decision to fire Weber, a jury could infer from the evidence that Frier [who had allegedly made discriminatory comments about Weber] had substantial input in the decision-making process"); *Hunt v. Tektronix, Inc.*, 952 F.Supp. 998, 1006–07 (W.D.N.Y.1997) (genuine issue of material fact existed as to pretext where inference could be drawn that non-decisionmaker who made discriminatory comments had larger role in termination than that alleged by defendant); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("liability depends on whether the protected trait ... actually played a role in [the employer's decisionmaking] process and had a *determinative influence* on the outcome") (quotation marks and citation omitted; emphasis added; alteration in original); *but see Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 289–91 (4th Cir.2004) (en banc) ("declin[ing] to endorse a construction of the discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision") (7–4 decision).

■ As stated, McLean admits that "[a]t some time," he "did become aware that Dr. Siegel shared [McLean's] opinion" that Sadki was unqualified for the position. Although McLean claims that he had already formed that opinion on his own, with no prior input from Siegel, a jury might well find otherwise. At this point, it is unclear when McLean and Siegel talked about plaintiff's qualifications, nor is there proof, aside from McLean's own statement, of when McLean compiled his ranking of the four candidates. This matter, then, raises an issue of credibility, which is for a jury to decide at trial, not for the Court on a motion for summary judgment. *See Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir.2003) ("It is well established that '[c]redibility assessments, choices between conflicting versions of the

events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment'") (quoting *Fischl v. Armitage*, 128 F.3d 50, 55–56 (2d Cir.1997)).

Although defendant argues that plaintiff has no proof of any communications between Siegel and McLean that would tend to cast doubt on McLean's assertion that Siegel's opinion of plaintiff had no bearing on his decision to recommend that plaintiff not be selected, it is clear from McLean's own declaration that he and Siegel did talk about plaintiff, and that Siegel expressed the opinion that plaintiff should not be selected for the position. Again, the extent to which Siegel's opinion influenced McLean's decision about whom to recommend is for the trier of fact to decide.[5] *See Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir.1996) ("The degree to which [the ultimate hiring officer]'s decisions were based on his own independent investigation is a question of fact which has yet to be resolved at the district court level"); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1565 (11th Cir.1987) (reversing district court's grant of summary judgment for the employer because an issue of material fact remained as to whether the alleged harasser influenced the decisionmaker to fire the plaintiff).

Moreover, the Second Circuit has on some occasions noted that "an extra measure of caution is merited" when deciding whether summary judgment is proper in a discrimination action because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.2001) (citing *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994)). Thus, the fact that plaintiff has no direct proof of the substance of any relevant conversations between McLean and Siegel is hardly surprising. *See Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 112 (2d Cir.2001) (noting that "smoking guns are rarely left in plain view"); *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996) (observing that "it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason"); *Bickerstaff*, 196 F.3d at 448 ("courts must 'be alert to the fact that [e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law'") (quoting *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464–65 (2d Cir.1989)).

There is also some evidence that Siegel did harbor discriminatory animus toward plaintiff on account of his race, national origin, or religion. There is, for example, the alleged "Moroccan" comment. True, the term "Moroccan" is not inherently derogatory, and not all references to a person's race, ethnic group, or national origin are probative of discrimination. Nonetheless, I believe that, depending on the testimony at trial, a factfinder might reason-

---

5. I realize that, strictly speaking, Yu was the ultimate decisionmaker, not McLean. Even defendant, however, focuses on McLean as the key player here. *See* Defendant's Memorandum of Law (Docket # 33) at 17 (referring to "McLean's decision not to hire plaintiff"). Certainly it would not be surprising if a university president gives great deference to a dean's recommendations for faculty positions, and the manner in which Yu endorsed Mc-Lean's recommendation–"I agree with your analysis. PY"–suggests that Yu did so here. At any rate, this too presents an issue of fact. *See Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir.2003) ("if there were competent evidence that the Personnel Division had acted as Schrager's 'cat's-paw' and rubber-stamped his recommendation, we would consider Schrager to be the [relevant] decisionmaker").

ably conclude that, when looked at in the context of the surrounding circumstances, this remark is some evidence that Siegel was prejudiced against plaintiff on account of his ethnicity.

According to plaintiff, he and Siegel were both in attendance at a school function attended by a number of faculty members and students, and Siegel called out from across the room, "Hey, you the Moroccan." That comment may have been no more than a good-natured, albeit ill-advised, attempt at humor, although given the apparently less than cordial relationship between Siegel and plaintiff, that seems unlikely. Calling someone from across a room by reference to his ethnicity, however, could also indicate a certain degree of discriminatory animus toward that person's ethnic group.[6] There is a subtle, but real, difference between *describing* someone by reference to his race or national origin, and *calling* someone in that way. For example, if person A, standing in a crowded room with person B, attempts to point out person C by saying to person B, "It's that black man standing over there," most people would not infer any animus from that statement. But if person A calls out to person C, "Hey you, black man," most people would react quite differently.

■ I recognize that there is authority that "simple teasing" is not actionable under Title VII. Cases in which the courts have stated that general principle, however, typically involve hostile work environment claims. *See, e.g., Manatt v. Bank of America, NA,* 339 F.3d 792, 798 (9th Cir. 2003) (conduct of coworkers and supervisor of bank employee of Chinese descent,

including telling of jokes overheard by plaintiff in which phrase "China man" was used, was not objectively abusive and did not so pollute workplace as to alter conditions of plaintiff's employment). Sadki, however, is not asserting a hostile work environment claim, but a disparate treatment claim. The "Moroccan" comment, then, though not actionable in itself, is nevertheless some evidence of Siegel's attitudes. *See Chavez v. Illinois State Police,* 251 F.3d 612, 646 (7th Cir.2001) (though racially insensitive remarks do not by themselves violate the Constitution, they can be evidence of racial animus).

Plaintiff also alleges, in a statement attached to the complaint in this action, that the first time he met Siegel in 1990, "she went on about a story of a student in Tours who almost got raped by this Arab guy." Again, that is not necessarily indicative of discriminatory animus, but a factfinder might conclude that it is. The manner in which Siegel allegedly brought this up is not clear, but it seems odd for a person, upon meeting someone from North Africa, to mention that she knows someone who was nearly raped by an Arab.

■ In addition, the DHR decision states that a member of the department related "inappropriate comments that students had reported were made to them about [Sadki] by Ms. Siegel," and that another department member stated that he or she had "the impression that Ms. Siegel had problems working with people from other countries, especially Islamic ones." I realize that this is hearsay, and that the DHR's decision does not indicate the substance of the "inappropriate comments," or whether the latter witness tes-

---

**6.** Sadki, of course, is not Moroccan, but an Algerian Berber. If Siegel knew that, then that may be further evidence of her animus toward plaintiff, in the sense that she purposely lumped all North Africans together as

"Moroccans." Even if Siegel mistakenly believed plaintiff to be from Morocco, though, her calling him by that name could still be some evidence of animus, for the reasons stated in the body of this decision.

tified as to the basis for his or her "impression" about Siegel's attitudes toward people from Islamic countries. A court deciding a motion for summary judgment, however, can consider hearsay upon "a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir.1985). Since these persons made these statements to the DHR investigator, it seems likely that they could be called to testify at trial.[7] *See Savage v. Scripto–Tokai Corp.*, 266 F.Supp.2d 344, 352 (D.Conn.2003) (considering hearsay evidence, where it appeared that plaintiffs would "be able to present this evidence in admissible form at trial, either by calling the deponents themselves or establishing their unavailability").

██ The DHR decision is also itself some evidence that the Court can consider. *See Paolitto v. John Brown E. & C.*, 151 F.3d 60, 65 (2d Cir.1998) (whether to admit EEOC or state-agency findings is committed to the sound discretion of the district court); *see also Adams v. Monroe County Dep't of Social Services*, 21 F.Supp.2d 235, 241 (W.D.N.Y.1998) ("Although not binding on this court, [the EEOC's] findings are entitled to some weight") (citing *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir.1985)). This is not a case where the agency's decision is "conclusory and completely devoid of analysis," *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir.2000). Rather, the DHR decision sets forth a number of relevant facts and evidence, and explains how that evidence supports an inference of discrimination.

Although the evidence of discriminatory intent is not overwhelming, then, I believe that plaintiff has proffered at least enough evidence to meet the *de minimis* burden required to make out a prima facie case. Defendant having proffered a legitimate, nondiscriminatory reason for the decision not to offer plaintiff the position, it becomes plaintiff's burden at this stage to show that there exists a genuine issue of fact about whether that proffered reason is a pretext for discrimination. I find that plaintiff has done so.

██ In *James*, 233 F.3d at 156–57, the Second Circuit held that "evidence satisfying the minimal *McDonnell Douglas* prima facie case, coupled with evidence of falsity of the employer's explanation, may or may not be sufficient to sustain a finding of discrimination." In order to determine whether a plaintiff's case is sufficient to bar summary judgment, the court must "analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove-particularly discrimination." "Evidence suggesting that the defendant's proffered reason is false will certainly bear upon, but is not necessarily dispositive of, that issue." *McFadden*, 195 F.Supp.2d at 446. *See also Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive").

Here, there is some evidence that defendant's stated reasons for not selecting plaintiff-his lack of a Ph.D. in French and

---

7. I also note that plaintiff alleges that after someone else was chosen for a position for which he had applied in 1992, one Susan Benwood, who was then an adjunct professor at Brockport, told him that Siegel had stated to her: "I will never hire someone who is not an American. Why should we give jobs to foreigners?" *See* Attachment to Complaint. Although this statement appears to be inadmissible hearsay, and therefore does not form a part of the basis for my decision, I mention it only to note that if Benwood were available to testify at trial, such testimony might also be admissible to show animus on Siegel's part.

his "minimal" scholarship and publications-are pretextual. For one thing, McLean's statement that he was surprised that the department had not tailored the hiring criteria to match plaintiff's credentials suggests that, if the department *had* so tailored the criteria, McLean might have recommended to Yu that plaintiff be selected for the position. Yet McLean knew, after receiving the committee's recommendations and meeting with members of the department, that Sadki-in McLean's own words-was the department's "top choice." McLean Decl. Ex. F. Since the department-which drafted the hiring criteria-was obviously not troubled by Sadki's lack of a Ph.D. in French, or by his relative lack of published research, a factfinder could question the credibility of McLean's claims that those were the reasons for his decision, and that Siegel's input had no bearing on his decision.

In addition, as the DHR investigator noted, the two committee members that he interviewed did not recall McLean even mentioning Sadki's degree when he met with them to discuss his concerns about Sadki. Plaintiff also states that when McLean interviewed him, McLean asked him nothing about plaintiff's Ph.D., research, teaching, or other qualifications. Sadki Decl. ¶ 5. Although McLean states that there was no need for him to ask about such matters, since "Dr. Sadki's credentials were listed on his resume," McLean's Response to Interrogatories (Docket # 26) at 1, again a jury might well decide, after hearing the testimony at trial, that this explanation is not credible.

Defendants point out that the other deans whom McLean consulted were also of

the opinion that plaintiff was not qualified for the position. It appears, however, that McLean simply gave them the job description and plaintiff's CV. They did not have the benefit of the committee's recommendations, which highly praised plaintiff's qualifications for the position. At any rate, even if the finder of fact considers this to be persuasive evidence that defendant's stated reason for not selecting plaintiff is true, it is not enough for this Court to reach that conclusion as a matter of law on a motion for summary judgment.

I also note that although Siegel asserts that she did not know what plaintiff's national origin was,[8] *see* Patricia Siegel's Response to Plaintiff's Interrogatories (Docket # 31) ¶ 6, she also states that she read plaintiff's application file, *id.* ¶ 1, which presumably included his CV.[9] Plaintiff's CV does not expressly state plaintiff's country of origin, but it does state that he received a bachelor of arts degree from Algiers University, McLean Decl. Ex. B, which would certainly suggest a strong possibility that plaintiff was Algerian. At any rate, if Siegel did refer to plaintiff as "the Moroccan," that indicates that she believed him to be from somewhere in North Africa.

In addition, the person who was selected for the position, Wilkerson, did not yet have her doctorate at the time she was selected. Defendant contends that for entry-level positions, it was customary to consider candidates who were "ABD" (All But Dissertation), *i.e.,* nearly finished with their doctoral program. Even if that were true, however, it is some evidence that the minimum requirements stated in the job

---

8. Siegel does not state when she first learned of plaintiff's national origin, but presumably she means that she was unaware of his national origin at the relevant time, *i.e.,* at the time of the selection process for the position.

9. The search authorization states that applicants would be required to submit, *inter alia,* their resumé. *See* McLean Decl. Ex. A.

description were not as rigid as defendant suggests.

There is also evidence that, contrary to usual practice, Siegel did not sign a certain paper in Sadki's file certifying that she had reviewed plaintiff's application. She states that she does not remember why she did not do so, and that she may have simply neglected to sign in her haste to hand back the file in a timely manner. *See* Siegel's Response to Plaintiff's Interrogatories at 2. Siegel also did not submit any written recommendation of her own to McLean, but there is no doubt that she did discuss the vacancy with McLean prior to his submission to President Yu. Defendant's Rule 56.1 Statement, ¶¶ 32, 34 (Dkt.# 34). Instead, when she forwarded the committee's recommendations to McLean, she attached a cover letter that simply stated, "I have received, read and hereby submit to you the letter concerning the candidates from the members of the Department." McLean Decl. Ex. D.

McLean states, with respect to Siegel's failure to submit her own recommendation, that he "was very familiar with the 'political' issues in the department and appreciated the position [Siegel] was in. I understood that she did not want to go 'against' the Search Committee's recommendation, so I suggested that she simply transmit the Committee's recommendation to me for consideration without taking a position one way or the other." McLean's Response to Interrogatories at 3. From this a jury could reasonably infer that McLean already knew Siegel's opinion of Sadki and that it was contrary to the Search Committee's favorable report.

Although one could argue that, if Siegel truly wished to torpedo plaintiff's candidacy, she *would* have submitted her own (negative) opinion, one could also view these omissions on her part as evidence that she wanted to create the appearance

that she had played no part in the decisionmaking process. Since, on this motion, the Court must view the record in the light most favorable to plaintiff, and draw all inferences in his favor, *see Hayut v. State University of New York,* 352 F.3d 733, 743 (2d Cir.2003), I find that this evidence, combined with all the other evidence discussed above, creates a genuine issue of material fact about whether Siegel, acting out of impermissible motives, so influenced McLean's conclusion that plaintiff was unqualified for the position that her discriminatory animus became a motivating factor in the ultimate decision to offer the position to Wilkerson instead.

## CONCLUSION

Defendant's motion for summary judgment (Docket # 32) is denied.

IT IS SO ORDERED.