**Bobby Leepiei GREEN, Plaintiff,**

**v.**

**HARRIS PUBLICATIONS, INC., Stanley Harris, and Dennis Page, Defendants.**

**No. 02 Civ. 9825(DC).**

United States District Court, S.D. New York.

Aug. 11, 2004.

---

Joseph Deliso & Associates, By: Joseph A. Deliso, New York, New York, for Plaintiff.

Jackson Lewis LLP, By: Felice B. Ekelman, Elizabeth Franqui, New York, New York, for Defendants.

## OPINION

CHIN, District Judge.

In this employment discrimination case, plaintiff Bobby Leepiei Green alleges that defendants Harris Publications, Inc. ("Harris Publications"), Stanley Harris, and Dennis Page (collectively "defendants") subjected him to a hostile work environment, failed to promote him, and constructively discharged him from his employment with Harris Publications, purportedly because of his race and sex, in violation of federal, state, and city law. Green also asserts a claim for intentional infliction of emotional distress. Defendants move for summary judgment dismissing all claims. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

### A. The Facts

Construed in the light most favorable to plaintiff, the non-moving party, the facts are as follows:

#### 1. The Parties

At all times relevant to the instant action, Harris Publications was a publishing company privately owned by Harris, a white male, and in the business of publishing magazines, including XXL, a hip-hop magazine; GuitarWorld; and Revolver. (Compl. ¶ 11; Page Dep. at 5–6, 14, 15). At all relevant times, Page, a white male, was the publisher of XXL, GuitarWorld, and Revolver. (Compl. ¶ 12; Page Dep. at

6). Plaintiff is an African American/Native American male who began his employment at Harris Publications in December 2000 in the retail sales and promotions department for GuitarWorld and Revolver. (Green Aff. at 1; Green Dep. at 33–34).

### 2. The Alleged Discriminatory Conduct [1]

Sometime in December 2000, while Page was on a telephone call in his office, plaintiff overheard Page remark, "oh, those niggers." [2] (Green Dep. at 81, 84–85).

Approximately one month later, sometime in January 2001, plaintiff was told by Aari Jubran, the manager of retail sales and promotions and plaintiff's immediate supervisor, that "Page sold [Honey magazine] because he said that ... the 'Honey girls' [African–American Women who worked for the magazine Honey] were uncontrollable blacks." [3] (Green Dep. at 81, 87; Jubran Dep. at 25). Plaintiff does not know when Page made the remark.[4] (Green Dep. at 87–88).

In the "middle months" of 2000, plaintiff overheard Page say the words "my nigger"

to a Hispanic employee in the mail room. (Id. at 86). In approximately March or April 2001, Joan Cadmucker, an employee of Harris Publications, approached plaintiff and stated that she had heard Page say that a "Blackberry pager should be called a 'Whiteberry' pager because it uses proper English." (Green Dep. at 82, 88, 248). Plaintiff does not know when Page made the statement. (Id. at 88).

In May 2001, plaintiff learned that the position of assistant to Donald Morris, creative director of XXL, had become available.[5] (Green Aff. at 1). Plaintiff interviewed for and was offered the position by Morris. (Morris Dep. at 26). Shortly thereafter, however, Morris withdrew the job offer, informing plaintiff that when Morris told Page he had hired plaintiff, Page told Morris, "no, just hire a white girl." (Morris Dep. at 26). Morris then hired a Caucasian female to fill the position. (Id. at 155–156).

In approximately July or August 2001, plaintiff found a picture of Dennis Rodman on his desk that had been altered to dis-

---

1. Because plaintiff's post-deposition affidavit differs from his deposition testimony with respect to the time frame pursuant to which the alleged discriminatory conduct occurred, the Court (1) relies on the time frame as testified to by plaintiff in his deposition for purposes of setting forth the facts of the case and (2) notes where his affidavit sets forth different information.

2. According to plaintiff's affidavit, it was in approximately May 2001 that he heard the words coming from Page's office. (Green Aff. at 2).

3. According to plaintiff's affidavit, it was sometime during or after May 2001 that plaintiff was "told that references were made by the management of XXL that the 'honey girls' ... were 'uncontrollable blacks' and that Harris wanted to and did get rid of them." (Green Aff. at 2–3).

4. Honey magazine was sold by Harris Publications in January 2000, approximately eleven months prior to plaintiff's employment with Harris Publications. (Morris Dep. at 195).

5. There appears to be some dispute regarding the title of the available position. Throughout their papers, defendants refer to this position as the production coordinator/photo editor position, while plaintiff refers to it as the assistant to the creative director of XXL. (See, e.g., Defs.' Rule 56.1 Statement ¶¶ 34–53; Green Aff. at 1; see also Equal Employment Opportunity Commission (the "EEOC") determination letter dated July 25, 2002 at 1 (referring to the position as that of "assistant art director")). Because I am construing the facts in a light most favorable to plaintiff, for purposes of this motion I will assume that the available position was the assistant position described by plaintiff and will refer to it as such.

play exaggerated facial features. (*Id.* at 83, 89).

Sometime between August and September 2001, plaintiff was offered a position in advertising sales.[6] (Green Aff. at 3–4). Plaintiff was told by a co-worker named Chris Mark that "a rumor around the office" was that "they said [the position] was a token job for a token nigger." (Green Dep. at 78).

In November 2001, Morris was discharged from Harris Publications.[7] (Green Aff. at 3). After Morris's discharge, plaintiff was told by "a girl from Braids [magazine]" that Harris asked certain African–American employees to "write [a statement] that everything was okay to work [at Harris Publications]." (Green Dep. at 212–13). Plaintiff was not asked to write and sign such a statement. (Green Aff. at 3; Green Dep. at 216) (where plaintiff testified as follows: "[Cadmucker] asked me did they ask you to write something about the environment, that the working environment here was okay. I went no. She was like yes, they are making some selected people. I was like they didn't ask me.").

Further, after plaintiff was offered the position, "they" began to "harass [him] to take the position in advertising by yelling at [him], standing over [him,] and monitoring [him] in a degrading manner." (Green Aff. at 3).

After being offered the advertising sales position, plaintiff was told by Greg DiBenedetto, the advertising director,[8] "we'll move you into the other office so we can

get you out of the ghetto." (Green Aff. at 3). Plaintiff testified at his deposition that he was uncertain as to what DiBenedetto meant by the remark:

Q: Did you ever hear [DiBenedetto] use any inappropriate or offensive language?
A: The only time that I heard [DiBenedetto] at what he said was defending me was going to get you out of the ghetto.
Q: Your testimony was that you didn't know what he meant [by] that?
A: Yes, I didn't know if that was because I worked in Harlem or the broken ceilings.
Q: You didn't work in the area with the broken ceilings?
A: Yes, they called it the ghetto. I don't know if he is saying that because of the area that I worked or because I lived in Harlem.

(Green Dep. at 93; *see also id.* at 38 (where plaintiff stated that DiBenedetto "came into the office and said we are going to get you out of the ghetto because I was living in Harlem or towards the middle to the back of the office where the whole construction of the office is like hanging down wires and stuff from the ceiling")).

### 3. *Plaintiff's Departure from Harris Publications*

Plaintiff's last day of work was January 8, 2002. (Green Dep. at 4; Rheingold Aff. ¶¶ 10, 11; Sherman Aff. Ex. G). Plaintiff had a dentist appointment in the morning and did not arrive at work until noon. (Green Dep. at 93). The dentist apparent-

---

**6.** According to his affidavit, plaintiff was offered the position sometime during or after November 2001. (Green Aff. at 2).

**7.** In a separate action, Morris asserted a retaliation claim against defendants based upon his discharge. *See Morris v. Harris Publications, Inc.*, 01 Civ. 8119. That case has been settled.

**8.** Plaintiff refers to DiBenedetto as the advertising director while defendants refer to him as an associate publisher. (*See* Pl.'s Opp. at 23; Defs.' Reply Mem. at 2 n. 1). For purposes of this motion, he will be referred to as the advertising director.

ly called Jubran that morning to inform him that plaintiff was going to be late for work. (*Id.* 94–95). When plaintiff arrived at work, DiBenedetto was waiting for plaintiff at his work station. (Rheingold Aff. ¶ 1; Green Dep. at 95). According to plaintiff, the following then ensued:

> I came in, there is [DiBenedetto] waiting at my cube, where have you been, where have you been, you know, ... [Jonathan] Rheingold [an associate publisher of Revolver, King, and XXL magazines and retail sales manager for Guitar-World magazine] wants me to talk to you about this position [the advertising position that had been offered to plaintiff]. You know. I'm like I have been at the dentist. Did you talk to [Jubran], you know that my dentist called [Jubran] and left it on his machine. We went into [DiBenedetto's or Rheingold's office].
>
> . . . . .
>
> [T]hey are like saying you got to be on time more. I said I went to the dentist. He said that well, this position is—it's long hours, you have to be here earlier. [DiBenedetto] was totally cool like we want you to take this position, you know. Rheingold started like I don't think this guy wants this position, what is this guy, pretty much started yelling and cursing at me and [DiBenedetto] was like no, no, no, that is cool."

(Green Dep. at 95–96). Rheingold then received a phone call, at which time plaintiff went to his work area, packed his belongings and left. (*Id.* at 96).

### B. *Procedural History*

On February 19, plaintiff filed a charge against defendants with the EEOC. (EEOC Determination Letter at 3). As stated in its determination letter, the EEOC found that (1) Harris Publications "subjected Black employees to a racially hostile environment"; (2) plaintiff was "denied the position of assistant art director based on his race and sex"; (3) plaintiff was "constructively discharged due to his race based upon the discriminatory denial of the promotion he sought and the continuous racially hostile environment that he was forced to endure until his departure"; and (4) there is "reasonable cause to believe that [plaintiff] was discriminated against[ ] in violation of Title VII." (*Id.* at 2–3).

With respect to the finding of a racially hostile work environment, the EEOC determined that "[t]he issue of whether Black employees were subjected to a racially hostile environment by [Harris Publications] is discussed in detail in the [l]etter of [d]etermination issued pursuant to [ ] Morris's charge (Charge No. 160–A2–00349), and will not receive further addressed [sic] here." (*Id.* at 1). The parties have not submitted Morris's EEOC determination letter for the Court's consideration.

On September 26, 2002, the EEOC issued plaintiff a Right to Sue letter. (Compl.¶ 7).

### C. *The Instant Action*

Plaintiff filed the instant suit on December 13, 2002, alleging violations of Title VII, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"); the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) *et seq.* ("Section 1981"); the New York State Human Rights Law, New York Executive Law § 290 *et seq.;* and the New York City Human Rights Law, New York Administrative Code § 8–107. On August 15, 2003, the Court held a conference at which plaintiff agreed to withdraw any and all claims of discrimination based upon his alleged Native–American national origin, and any and all claims under Title VII against Harris and Page in their individual capacities.

The parties engaged in discovery and the instant motion for summary judgment

followed. For the reasons set forth below, defendants' motion is denied with respect to plaintiff's discriminatory failure to promote claim and granted with respect to all other claims.

## DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248–49, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *accord Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586, 106 S.Ct. 1348. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. To that end, any "[a]ffidavits submitted in support of or in opposition to a summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed.R.Civ.P. 56(e)). The requirement set forth in Rule 56 that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit "also means that an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Id.* at 219; *see also H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454–55 (2d Cir.1991) (hearsay assertion that would not be admissible if testified to at trial is not competent material for a Rule 56 affidavit).

### B. *Application*

I consider in turn plaintiff's claims for (1) failure to promote, (2) hostile work environment, (3) constructive discharge, and (4) intentional infliction of emotional distress.

#### 1. *Failure to Promote Claim*

#### a. *Applicable Law*

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met his or her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," *i.e.*, that there was discriminatory intent. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 119 (2d Cir.1997). Cases brought under Title VII are analyzed pursuant to the three-step test set forth in *McDonnell Douglas* and refined in later cases. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36

L.Ed.2d 668 (1973); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407; *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 311–12 (2d Cir.1997).

■ With respect to a discriminatory failure to hire or promote claim, a plaintiff must first establish a *prima facie* case of unlawful discrimination by showing that (1) he is a member of a protected category, (2) he applied for an available position, (3) he was qualified for the position, and (4) he was rejected under circumstances that give rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 (2d Cir.2000); *de la Cruz v. N.Y. City Human Resources Admin. Dep't of Soc. Servs.,* 82 F.3d 16, 20 (2d Cir.1996). "An inference of discrimination may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications [ ] or if the position was filled by someone not a member of plaintiff's protected class." *Gomez v. Pellicone,* 986 F.Supp. 220, 228 (S.D.N.Y.1997) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *de la Cruz,* 82 F.3d at 20).

Second, if the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to "articulate a legitimate, clear, specific and nondiscriminatory reason" for the employment decision. *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995); *see also Reeves,* 530 U.S. at 143, 120 S.Ct. 2097.

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742 (citation omitted). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See id.* at 515–

16, 113 S.Ct. 2742; *Lanier v. I.B.M. Corp.,* 319 F.Supp.2d 374 (S.D.N.Y.2004).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. It is not sufficient, however, for a plaintiff merely to show that he satisfies *"McDonnell Douglas'*s minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation ... was false." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 153 (2d Cir.2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination on the basis of race or gender or some other impermissible factor. *See id.* at 157; *Connell v. Consolidated Edison Co. of N.Y., Inc.,* 109 F.Supp.2d 202, 207–08 (S.D.N.Y.2000).

As the Second Circuit observed in *James,* "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia University–College of Physicians and Surgeons,* 999 F.Supp. 506, 513–16 (S.D.N.Y. 1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other

cases, the plaintiff has the ultimate burden of persuasion.").

### b. *Analysis* [9]

Plaintiff claims that defendants discriminated against him based upon his race and sex by denying him the assistant position with XXL. (Compl.¶¶ 28–30). Defendants argue that summary judgment should be granted in their favor because, *inter alia*, plaintiff cannot make out a *prima facie* case because he (1) was not qualified for the position with Morris and (2) cannot establish that he was denied the position under circumstance that give rise to an inference of discrimination. (Defs.' Mem. at 11–16).

Plaintiff argues that summary judgment should be denied because (1) plaintiff was qualified for the job, (2) he was illegally denied the job based upon his race and sex, and (3) defendants' reason for denying him the position is pretextual. (Pl.'s Opp. at 10–21). Because a reasonable juror could conclude that defendants discriminated against plaintiff in failing to hire him for the assistant position, defendants' motion for summary judgment with respect to this claim is denied.

At the outset, I assume that plaintiff has made out the *prima facie* case required by *McDonnell Douglas*—indeed, Morris offered him the position and thus a jury could find that plaintiff was qualified for the position. (Morris Dep. at 26). Defendants have articulated a legitimate, nondiscriminatory reason for plaintiff's termination, contending that "Rheingold denied the request to transfer [p]laintiff to a position on XXL magazine—an entirely different magazine and department than that to which [p]laintiff had been assigned—be-

cause he had been grooming [p]laintiff for a position in [a]dvertising [s]ales and neither [p]laintiff nor [ ] Morris consulted him about [p]laintiff's transfer." (Def.'s Mem. at 16 (citing Rheingold Aff. ¶¶ 5, 6; Page Dep. at 130)). Hence, I proceed directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find discrimination. I do so by evaluating first plaintiff's evidence, then defendants' evidence, and finally the record as a whole, keeping in mind the elusiveness of proof of discrimination and the principle that the jury is "entitled to view the evidence as a whole." *Stern*, 131 F.3d at 314; *see also Siano v. Haber*, 40 F.Supp.2d 516, 520 (S.D.N.Y. 1999), *aff'd mem.*, 201 F.3d 432 (2d Cir. 1999).

### i. *Plaintiff's Evidence*

Plaintiff offers, *inter alia*, the following evidence in support of his discriminatory failure to promote claim:

First, Morris testified that plaintiff was denied the job because Page told Morris "to just hire a white girl." (Morris Dep. at 45, 52, 53–54). Morris then did, in fact, hire a Caucasian female to fill the position. (*Id.* at 155–56).

Second, when plaintiff approached DiBenedetto about an available promotion director position, he was told by DiBenedetto that "they had already hired a girl." (Compl. ¶ 42; Green Dep. at 223).

Third, plaintiff points to several purportedly discriminatory comments. On at least two occasions plaintiff overheard Page use the word "nigger": once while Page was on the telephone in his office, and once while Page was in the mailroom

---

**9.** I address plaintiffs' Title VII and state and city law claims together because race and gender claims brought under the New York State Human Rights Law and the New York City Human Rights Law are subject to the same analysis as such claims brought under Title VII. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 n. 2 (2d Cir.2003); *Cruz v. Coach*, 202 F.3d 560, 565 n. 1 (2d Cir.2000).

and referred to a mailroom employee of Hispanic origin as "my nigger." (Green Dep. at 81, 84, 86). Plaintiff was told by co-workers that Page made the following two discriminatory remarks: (1) the women who worked for Honey magazine were "uncontrollable blacks" and (2) a "Blackberry pager should be called a 'Whiteberry' pager because it uses proper English." (*Id.* at 81–82, 87–88, 248). After being denied the assistant position, plaintiff found on his desk a picture of Rodman that had been altered to display exaggerated facial features. (*Id.* at 83, 89).

Fourth, the EEOC determined that (1) defendants failed to promote plaintiff based upon his race and sex, (2) defendants created a hostile work environment, and (3) plaintiff was constructively discharged from Harris Publications. (EEOC determination letter at 3).

### ii. *Defendant's Evidence*

Defendants offer, *inter alia,* the following evidence in support of their motion for summary judgment:

First, Rheingold denied the request to transfer plaintiff to XXL because he had been grooming plaintiff for a position in advertising sales, and neither plaintiff nor Morris consulted him about plaintiff's transfer. (Rheingold Aff. ¶¶ 5, 6; Page Dep. at 130).

Second, Morris did not have the unilateral authority to transfer employees between magazines without approval. (Morris Dep. at 66, 85–86; Page Dep. at 42, 150).

Third, none of the discriminatory comments, if made, were directed at plaintiff.

Fourth, plaintiff has no idea when, if ever, the remarks regarding the Honey magazine women and the Blackberry pagers were made. (Green Dep. at 82, 87–88, 248).

Fifth, with respect to the altered Rodman picture, defendants' point to Morris's testimony that (1) the picture was created sometime in 1997—over three years prior to plaintiff's employment by Harris Publications—by an individual who was not employed by the defendant, and (2) Morris retained a copy of the picture to show to various employees of Harris Publications. (Morris Dep. at 239–42; Morris Dep. at 13, 141–43, 153–54, 219–20).

### iii. *The Record As a Whole*

■ Considering the evidence as a whole, and resolving all conflicts in the evidence and drawing all reasonable inferences in plaintiffs' favor, I conclude that a reasonable jury could find that plaintiff's race and sex were factors in his failure to obtain the assistant position. Plaintiff interviewed for and was subsequently offered the position by Morris, who then withdrew the offer, telling plaintiff that Page told him "no, just hire a white girl." (Green Dep. at 26). Morris then hired a Caucasian female to fill the position. (Morris Dep. at 155–56). On these facts alone a reasonable jury could find that plaintiff was discriminated against on the basis of his sex and race by defendants' alleged preference for "a white girl" for the assistant position. Hence, even assuming that some or all of the alleged discriminatory comments and the EEOC determination are inadmissible, as defendants contend, their motion for summary judgment is denied with respect to this claim.

I note that in addition to their arguments with respect to the assistant position, defendants argue that plaintiff has failed to present a *prima facie* case for failure to promote with respect to the promotions director position. (Defs.' Mem. at 10; *see also* Compl. ¶ 42 (stating that when plaintiff requested a promotion director

position, he was told by DiBenedetto that "they had already hired a girl")). · It appears, however, that plaintiff is not arguing a claim for discriminatory failure to promote with respect to this position. Rather, plaintiff is using the fact that the position was filled by a female as evidence of the "discriminatory hiring and promotion policy of the defendants." (Compl.¶ 42). In any event, as plaintiff only inquired about the position after it was filled, he cannot present a *prima facie* case for defendants' discriminatory failure to promote him to that position. *See Legrand v. N.Y. Rest. School/Education Mgmt Corp.*, 02 Civ. 2249, 2004 WL 1555102, \*\*6–7, 2004 U.S. Dist. LEXIS 12893, at \*18–19 (S.D.N.Y. July 12, 2004). Thus, to the extent that plaintiff was asserting such a claim, summary judgment is granted in favor of defendants.

## 2. *Hostile Work Environment Claim*

### a. *Applicable Law*

To prevail on a hostile work environment claim under Title VII, "a plaintiff must first show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir.2004) (internal quotations and citations omitted); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (to defeat a summary judgment motion on a claim of racially hostile work environment, "a plaintiff must produce evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment") (internal quotation marks omitted).

■ The misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive the environment to be abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Additionally, the plaintiff must demonstrate that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996).

As the Second Circuit held in *Patterson v. County of Oneida*, 375 F.3d 206 (2d Cir.2004):

> The matter of whether the conduct alleged was so "severe or pervasive" as to create "an objectively hostile or abusive work environment," is to be decided based on the totality of the circumstances, in light of such factors as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Id.* at 227 (quoting *Harris*, 510 U.S. at 21, 23, 114 S.Ct. 367). Further, "where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Id.* at 227.

### b. *Analysis* [10]

Plaintiff alleges that defendants subjected him to "a blatantly hostile work environment for black persons." (Compl.¶ 53).

---

**10.** In analyzing plaintiff's hostile work environment claim brought under Section 1981, I use the same standard of proof as applied in Title VII cases. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir.2000).

Defendants argue that summary judgment should be granted in their favor with respect to this claim because, *inter alia,* plaintiff "cannot point to a single racially hostile or abusive comment or incident directed toward him during the thirteen months that he worked for Harris Publications." (Defs.' Mem. at 6). The only argument plaintiff makes with respect to his hostile work environment claim is that because the EEOC found that "defendants subjected African American employees to a racially hostile environment," "questions of fact are presented for a jury to decide." (Pl.'s Opp. at 27). For the reasons set forth below, no reasonable juror could conclude that plaintiff's work environment was " 'permeated with discriminatory intimidation, ridicule and insult' " that was so severe or pervasive as to alter the conditions of his employment. *Torres,* 116 F.3d at 630–31 (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367).

In considering plaintiff's claim, I first address the extent upon which I rely on plaintiff's EEOC determination letter and then proceed to the merits of the claim.

### i. *EEOC Determination Letter*

█ The consideration, if any, to be given to EEOC findings is within the sound discretion of the trial judge. *Paolitto v. John Brown E. & C.,* 151 F.3d 60, 65 (2d Cir.1998) (establishing Second Circuit's rule that consideration to be given agency's determination is within the trial judge's discretion, depending on its quality and factual detail); *see also Parrish v. Sollecito,* 280 F.Supp.2d 145, 166–67 (S.D.N.Y.2003) ("the EEOC charge ... should be excluded because the documents relating to the EEOC investigation and findings ... contain hearsay statements not necessarily made under reliable circumstances"); *Sadki v. Suny College at Brockport,* 310 F.Supp.2d 506, 517 (W.D.N.Y.2004) (in declining to exclude agency decision from evidence on a summary judgment motion, the court noted that, as the decision "sets forth a number of relevant facts and evidence, and explains how that evidence supports an inference of discrimination," "[t]his is not a case where the agency's decision is conclusory and completely devoid of analysis") (internal quotations and citations omitted).

Here, plaintiff's own sworn statements either differ from or contradict many of the EEOC's specific findings with respect to plaintiff's hostile work environment claim. For example, the determination states that plaintiff was asked and refused to sign a statement that he had not been subjected to racial harassment on the job (EEOC determination letter at 2), while plaintiff states in his affidavit and during his deposition that he was not asked to sign such a statement. (Green Aff at 3; Green Dep. at 212–13, 216).

Further, according to the EEOC determination plaintiff began training for the advertising sales position but "objected to a transition period during which he was expected to learn and perform the new position while continuing to perform his old one." (EEOC determination letter at 2). Neither plaintiff's affidavit nor his deposition testimony makes mention of such a situation, however, and in fact, according to plaintiff's deposition testimony, plaintiff never accepted the job offer. (Green Dep. at 74, 227–28).

█ Consequently, I exercise discretion to exclude the EEOC's specific findings with respect to plaintiff's hostile work environment claim. As to the EEOC's final conclusion that plaintiff was subjected to a hostile work environment, I assume for purposes of this motion that it is admissible.

### ii. *The Merits*

█ At the outset, I assume, as I must, that the subjective element of the hostile

work environment claim has been satisfied, that is, plaintiff perceived his work environment to be hostile and abusive.[11] (Green Aff. at 3 (where plaintiff alleges that the "racial slurs and attention to [his] race" that he was experiencing while working for Harris Publications "was making [him] sicker and sicker")); *see also Powell v. Consolidated Edison Co. of N.Y., Inc.,* 97 Civ. 2439, 2001 WL 262583, *14, 2001 U.S. Dist. LEXIS 2706, at *46 (S.D.N.Y. March 13, 2001) ("there can be no dispute that the subjective requirement has been met, since [plaintiff] has clearly stated in sworn testimony that he perceived his working environment to be racially hostile"). Plaintiff has, however, failed to put forth sufficient evidence with respect to the objective element. For the reasons set forth below, I conclude that no reasonable juror could conclude that the discriminatory conduct was so severe or pervasive as to alter the conditions of plaintiff's employment.

First, plaintiff may not rely on the "token nigger" rumor as support for his claim. Plaintiff alleges that Mark told plaintiff that the rumor existed in the office. (Green Dep. at 78). Rumors are not evidence. Indeed, plaintiff cannot identify the individual who made the statement or when the statement was made. *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir.1999) (summary judgment was granted on claim where plaintiff's "statement as to what he 'was told' was hearsay that would not be admissible at trial"). Hence, the "token nigger" rumor is inadmissible.

Second, comments that plaintiff learned of second-hand, such as the "uncontrollable blacks" and "Blackberry pager" remarks, add little to plaintiff's hostile environment claim. As to the "uncontrollable blacks" remark (*see* Green Dep. at 81, 87 (where plaintiff testifies that Jubran told plaintiff that Page made the comment to Jubran)), it was not directed at plaintiff, nor does he allege that it was said in the presence of any African American employees. Moreover, plaintiff does not know when the remark was made. Similarly, the "Blackberry pager" remark (*see id.* at 82, 88, 248 (where plaintiff testifies that Cadmucker told plaintiff that she heard Page make the remark)), was not directed at plaintiff, nor does he allege that it was said in the presence of any African American employees. Plaintiff also does not know when this remark was made. Consequently, under the present circumstances, evidence of the retelling of these alleged discriminatory statements that were made at some unspecified point in time, perhaps not even during the relevant period of employment, is not evidence of the existence of a hostile work environment.

Third, the "my nigger" and "oh those niggers" remarks (*see id.* at 81, 84–85, 86) are stray remarks at best. *Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 56 (2d Cir.1998) ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination."). They were not directed at plaintiff, nor can he provide any context surrounding the circumstances

---

**11.** In arguing that plaintiff's work environment was not hostile or abusive, defendants note the following testimony: (1) XXL is a hip-hop magazine that often contains the word "nigger" in print (Page Dep. at 6); (2) prior to becoming employed by Harris Publications, plaintiff read XXL, was aware of the language used in the magazine, and did not find it offensive (Green Dep. at 200); and (3) plaintiff has written and performed music that contains the word "nigger" that he had, at times, played from his workspace at Harris Publications. (*Id.* at 167–68). While such testimony is relevant in making a determination as to the subjective element of his claim, here, as stated above, I must presume the subjective element has been met.

under which the comments were made. Given the employment setting of a publishing company that produces magazines geared towards, *inter alia*, the hip-hop culture, without more, no reasonable juror could conclude that the words were said in a discriminatory manner.

Fourth, plaintiff attributes five of the complained of discriminatory incidents (the "just hire a white girl," "uncontrollable blacks," "Blackberry pager," "my nigger," and "oh, those niggers" comments) to Page, an individual with whom he had very little contact throughout his employment with Harris Publications. *Schwapp v. Town of Avon*, 118 F.3d 106, 110–11 (2d Cir.1997) ("whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment") (internal quotation marks and citations omitted). Specifically, aside from his initial interview, during plaintiff's thirteen months of employment he could only recall the following three conversations with Page:

Q: Other then your interview, did you ever speak with [ ] Page?

A. I can't remember, I can't remember if there was small talk. I can't remember.

. . . . .

Q: Other than during the interview, you can't recall any other conversation that you had with [ ] Page?

. . . . .

A: Yes.

Q: Tell me about your conversations with [ ] Page.

. . . . .

A: [Page] walked past where I was temporary [sic] sitting and said how are you doing.

Q: You said?

A: Fine.

Q: That was the extent of the conversation?

A: Yes.

Q: You testified that you spoke with [ ] Page at the Christmas party?

A: Yes.

Q: Was that the Christmas party 2000 or 2001?

A: The Christmas party 2000. . . .

Q: Do you remember what you and [ ] Page spoke about?

A: I can't remember.

Q: Then you testified that you once went into his office to give him a CD?

A: Yes, to drop off a CD in his office.

Q: Did you speak when you dropped off the CD?

A: I told him I was putting a CD. He wanted the CD and I told him I was putting it in his office.

Q: Did you have any conversation other than that?

A: No.

Q: Is that the only time?

A: Oh, as I recall he walked past me and said thanks.

(Green Dep. at 64–67, 241). Significantly, with respect to Harris and individuals with whom plaintiff did interact, specifically, Jubran and Rheingold, plaintiff testified that he did not feel discriminated against by such individuals. (Green Dep. at 68 (where plaintiff was asked "Do you believe [Jubran] discriminated against you?" plaintiff responded, "I have no reason to believe that"), 99–100 (where plaintiff was asked "Do you think [Rheingold] was discriminating against you?" plaintiff responded, "No, he has been cool"), 128 (where plaintiff was asked "Do you believe [Harris] discriminated against you?" plaintiff responded, "No")).

Fifth, the two incidents that were directed at plaintiff, the "ghetto" remark by

DiBenedetto and the picture of Rodman (*see* Green Dep. 38, 83, 89, 93), are not sufficiently severe or pervasive to enable plaintiff to overcome defendants' motion for summary judgment. *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir.2002) ("As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'") (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997)); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998) ("As a general matter, isolated remarks or occasional episodes will not merit relief under Title VII; ... to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive."), *abrogated on other grounds by, National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

In sum, given the thirteen-month time period involved, the conduct alleged by plaintiff, while certainly offensive and unquestionably inappropriate, was not sufficient to create a hostile work environment. After considering all of the circumstances discussed above in combination with plaintiff's failure to promote claim, such conduct is insufficiently severe or pervasive as a matter of law to have "altered the conditions of [plaintiff's] employment and create[d] an abusive working environment." *Feingold*, 366 F.3d at 149 (internal quotations and citations omitted). Consequently, as no reasonable juror could conclude that plaintiff was subjected to a hostile work environment, summary judgment is granted in favor of defendants with respect to this claim.

Finally, the EEOC determination, even assuming it is admissible to the extent discussed above, does not dictate a different result. The bare conclusion, unsupported by any specific, concrete, admissible evidence, is insufficient to generate a genuine issue of material fact for trial.

### 3. *Constructive Discharge Claim*

#### a. *Applicable Law*

In a recent decision, the Supreme Court held that "a hostile-environment constructive discharge claim entails something more [than a showing of a hostile work environment]: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, —— U.S. ——, ——, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004); *see also Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir.1998) (an employee is constructively discharged when an employer "deliberately [makes] his working conditions so intolerable that he [is] forced into an involuntary resignation").

#### b. *Analysis*

Plaintiff alleges that the racial slurs and harassment that he endured at Harris Publications "altered the conditions of his employment to such an unbearable degree, that [he] left the job." (Compl.¶ 65). Defendants argue that summary judgment should be granted in their favor with respect to plaintiff's constructive discharge claim because plaintiff "abandoned his job because he did not want the responsibilities of the [a]dvertising [s]ales position," not because his working conditions were intolerable. (Defs.' Mem. at 21).

Plaintiff's only argument with respect to his constructive discharge claim is that because the EEOC determined that plaintiff "was constructively discharged due to his race based upon the discriminatory denial of the promotion and the continuous racially hostile environment that he was forced to endure until his departure,"

"questions of fact are presented for a jury to decide." (Pl.'s Opp. at 27).

 For the reasons stated in connection with plaintiff's hostile work environment claim, no reasonable juror could conclude that plaintiff was constructively discharged due to his race. *See Legrand,* 2004 WL 1555102, **4–5, 2004 U.S. Dist. LEXIS 12893, at *13–14 ("The same circumstance and facts that a court examines in reviewing a plaintiff's hostile work environment claim are examined on a plaintiff's constructive discharge claim."). Even assuming the EEOC's conclusion that plaintiff was constructively discharged because of his race is admissible, the EEOC determination is not binding, and on the record before the Court, no reasonable jury could find a constructive discharge. Accordingly, defendants' motion for summary judgment with respect to this claim is granted.

#### 4. *Intentional Infliction of Emotional Distress Claim*

##### a. *Applicable Law*

 To prevail on a claim for intentional infliction of emotional distress under New York law, plaintiff must plead and prove the following four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal relationship between the conduct and the resulting injury; and (4) severe emotional distress. *See Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996); *Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993).

In analyzing an intentional infliction of emotional distress claim, courts look to the first element—whether the conduct was extreme or outrageous. *Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir.1999). Without "sufficiently outrageous" conduct, no claim for intentional infliction of emotional distress can be established. *Howell,*

596 N.Y.S.2d at 353, 612 N.E.2d 699 ("[T]he 'requirements of the rule are rigorous, and difficult to satisfy.'") (quoting *Prosser & Keeton on Torts* § 12, at 60–61 (W. Page Keeton ed., 5th ed.1984)); *see also Daniels v. Alvarado,* 03 Civ. 5832, 2004 WL 502561, *6, 2004 U.S. Dist. LEXIS 3893, at *16 (E.D.N.Y., March 12, 2004) ("Racial slurs on their own do not constitute conduct so 'extreme and outrageous' in nature as to sustain a claim for intentional infliction of emotional distress.").

##### b. *Analysis*

Plaintiff alleges that defendants' failure to promote plaintiff based solely upon his race and sex "was extreme[,] outrageous and intolerable in a civilized society." (Compl.¶ 50). Plaintiff further alleges that the environment of racial hostility at Harris Publication caused plaintiff extreme emotional and psychological distress. (Compl.¶ 73). Defendants argue that summary judgment should be granted in their favor with respect to plaintiff's intentional infliction of emotional distress claim because (1) to the extent that the claim involves incidents that occurred prior to December 13, 2001, the claim is time-barred under the governing one-year statute of limitations, and (2) plaintiff fails to allege conduct that rises to the level of extreme and outrageous. Plaintiff makes no argument with respect to this claim.

 Regardless of whether the alleged incidents comprising plaintiff's claim are timely, the conduct simply does not rise to the level of conduct that is "so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86 (1983); *see also Petrosino v. Bell Atlantic,* 99 Civ. 4072, 2003 WL

1622885, \*11, 2003 U.S. Dist. LEXIS 4616, at \*34 (E.D.N.Y. March 20, 2003) ("New York sets a high threshold for conduct that is 'extreme and outrageous.'"); *see also Daniels,* 2004 WL 502561, \*\*8–9, 2004 U.S. Dist. LEXIS 3893, at \*17–18 (employer's characterization of plaintiff employee as a "stupid nigger" is insufficient to sustain an intentional infliction of emotional distress claim); *Leibowitz v. Bank Leumi Trust Co.,* 152 A.D.2d 169, 548 N.Y.S.2d 513 (2d Dep't 1989) (use of the terms "Hebe" and "Kike" were not found to be so extreme or outrageous as to meet the threshold requirement for intentional infliction of emotional distress). Thus, as no reasonable juror could conclude that plaintiff has established a claim for intentional infliction of emotional distress, summary judgment is granted in favor of the defendants with respect to this claim.

### *CONCLUSION*

For the reasons set forth above, defendant's motion for summary judgment is granted in part and denied in part. The parties shall appear for a pretrial conference on August 20, 2004 at 3:00 p.m.

SO ORDERED.